CHEVY CHASE VILLAGE AND TOWN OF SOMERSET, MARYLAND, ET AL. *v.* MONTGOMERY COUNTY BOARD OF APPEALS, ET AL.

[No. 238, September Term, 1967.]

336

*Decided March 22, 1968.*

The cause was argued before HAMMOND, C. J., and HOR-NEY, MARBURY, BARNES, McWILLIAMS and SINGLEY, JJ.

*Alfred L. Scanlan,* with whom were *Shea & Gardner, Lambert, Furlow & Sheehan, Arthur G. Lambert, Rourke J. Sheehan* and *Robert L. Higgins* on the brief, for appellants.

*Norman M. Glasgow,* with whom were *George H. Clark, Whayne S. Quin, Wilkes & Artis* and *Carl Lee Frederick, Jr.,* on the brief, for appellee Property-Owners; no brief filed for other appellee.

HAMMOND, C. J., delivered the opinion of the Court.

This is the fourth effort the appellants, the Town of Somerset, the Village of Chevy Chase, and individual residents of these communities of predominantly expensive single-family homes, have made to prevent the issuance of a permit for the construction of a very high-rise luxury apartment house in the Town of Somerset near the Chevy Chase boundary. Having been unable to bar the issuance of the permit by the Director of the Department of Inspection and Licenses of Montgomery County (the Director), they went before the County Board of Appeals and the Circuit Court, unsuccessfully at each stage, and their main point in their appeal here is that they were unconstitutionally denied a hearing by the Director.

This is the third time that Somerset has been in this Court in its determination to prevent the appellees (hereinafter collectively referred to as Funger) from building an apartment house higher than fourteen floors. In this third scrimmage here Somerset escalated the conflict by the recruiting of Chevy Chase. Every detail of the background and of the various maneuvers and skir-

mishes between Somerset and Funger is set out in *Funger v. Somerset,* 249 Md. 311, and *Funger v. Mayor of Somerset,* 244 Md. 141, and will not be repeated. Suffice it to say that Somerset and Funger made this agreement in 1963—Somerset will recommend to the County Council (without its recommendation a two-thirds vote of the Council would be needed) R-H (high-rise) zoning for 18.1906 acres of an approximately thirty-acre tract of land in Somerset owned by Funger (the Bergdoll Tract) and Funger will (a) subject 2.1906 acres of the tract to a scenic and conservation easement, (b) limit for a period of twenty years the development of 16 acres to the uses currently permitted in an R-H zone and to the density currently permitted for 18.1906 acres, and (c) give Somerset 12 acres for use as a park. Somerset did support the zoning application for R-H zoning and on June 18, 1963, the County Council granted it for 18.1906 acres. In late 1964 Funger announced plans for thirty-story towers. The residents of Somerset were outraged, claiming that Funger had led them to believe and, in effect, promised buildings no higher than fourteen stories (although there is no restriction on height in the writings which integrated the ultimate agreement between Somerset and Funger), and we found in *Funger,* 249 Md. 329:

> "It was a natural corollary to the understanding reached as to use and density that the parties intended that * * * [Funger] should be entitled to erect any structure permitted in an R-H zone in Montgomery County. Since it is conceded that there was no limitation on the height of such structures, * * * [Funger] was not prohibited, under its agreement with Somerset, from erecting a 30 story building if otherwise in compliance with the Montgomery County Building Code."

Somerset, on June 15, 1965, passed an ordinance limiting the height of buildings in the town to seventeen stories or 160 feet. After our decision in *Funger,* 244 Md. 141, Somerset repealed its ordinance and the trial judge who heard the case on remand upheld the agreement.

Appellees presented a site plan under the R-H zoning law, showing an apartment house thirty stories high. The Director

advised Funger that the required setback in an R-H zone of one foot for each foot of height would not permit such a tall structure. Funger then applied for a permit for a twenty-four story building and, after considering the application for a considerable time, the Director on July 29, 1965, granted a permit for the excavation and foundation of a 210-foot building of twenty-four stories.

On March 26, 1965, counsel for Somerset wrote the Director a long letter "Re: Site Development Plans—Bergdoll Tract, Somerset * * *," in which he outlined the history of the controversy between Funger and Somerset and pointed out that under the County Code the Director had "been delegated certain powers and responsibilities with respect to approving and disapproving site development plans and issuing building permits for construction of apartment houses in the newly created R-H zone classification." The letter then quoted the purposes of the R-H zone to provide suitable sites for high density residential development, sites which will provide a maximum of light, air, and open space for the benefit of residents of the site and the surrounding area, and within these limits to provide the maximum freedom in design of residential structures and their grouping and layout within the zone without harm or detriment to adjacent properties.

The letter called the Director's attention to the information the ordinance requires an applicant for a building permit in an R-H zone to furnish. The permit must be for a building as shown on a plan of development approved by the Department of Inspection and Licenses for the lot or tract on which the structure will be built. The ordinance (Montgomery County Code (1960) Sec. 104-13A, id. (1965) Sec. 111-16), said the letter, goes on to state:

"Such plan of development shall show, in addition to the information required in section 104-43, the location and height of all buildings and structures; the area devoted to parking facilities and accessory buildings; all access roads and drives; the topography and major vegetation features now existing on the land; the proposed grading, landscaping and screening plans, rec-

reation, outdoor living, and other green areas; and such other features necessary for the evaluation of the development plan."

In reviewing the application, the Director must:

"* * * consider the standards and purposes of the R-H zone regulations with a view to achieving a maximum of coordination between the proposed development and the surrounding uses, the conservation of woodland and the protection of water courses from erosion and siltation, and a maximum of safety, convenience and amenity for the residents of the apartments within the development. To these ends the Department shall consider the location of buildings, parking areas and other features with respect to the topography of the lot and existing natural features such as streams and large trees; the efficiency, adequacy, and safety of the proposed layout of internal streets and driveways; the adequacy and location of the green area provided, bearing in mind the possible effects of irregularly shaped lots; the adequacy, location, and screening of the parking lots; and such other matters as the Department may find to have a material bearing upon the stated standards and objectives of the R-H zone regulations."

Section 104-13A, according to the letter, goes on to state that:

"If the Department finds that a proposed plan of development does not meet the purposes of these regulations, it shall disapprove the plan and shall submit its findings in writing, together with the reasons therefor, to the applicant, within 30 days after having received the site plan."

The letter then proceeded to argue to the Director that:

"A reading of the ordinance makes it convincingly clear that the important power which has been vested in your department to pass upon the adequacy of site development plans and to grant building permits for

apartment buildings to be constructed in an R-H zone can only be intelligently exercised after you have compiled a careful and comprehensive record of the pertinent facts relating to the basic question of whether or not the proposed plan of development complies with the legislative purposes which underlay the enactment of Section 104-13A and which are expressly set forth in the preamble thereof, as quoted *supra*.

"Accordingly, the Town of Somerset respectfully requests that, before you make any determination concerning the adequacy of any site development plans that may be submitted to you covering a proposed development of the Bergdoll Tract, you afford the Town's representatives an opportunity to examine such plans and, thereafter, at a hearing duly convened by you, that the Town, including its Counsel, and all other interested parties, *be given an opportunity to be heard and to submit data and address arguments concerning the adequacy of any site development plans submitted for your consideration.*"

Counsel for Somerset in effect conceded to the Director that no provision of law required him to hold a hearing, and said:

"However, even if no specific statutory provision expressly imposes the requirement of a trial or adversarial type hearing in this area, we read Section 104-13A to imply the necessity of providing, at the minimum, *a legislative type, public hearing,* at which the parties whose interests would be effected by any administrative action on your part would have the opportunity of presenting *data, views and argument* directed to the issues presented, unless such opportunity has been waived by the parties concerned."

Counsel concluded:

"* * * some sort of a public hearing would seem to be an indispensable condition precedent to * * * [the "decision-making power" of the Director] * * *. Elementary concepts of administrative due process * * *

argue most strongly that you should hold a public hearing before proceeding to approve or deny any site development plan for the Bergdoll Tract. * * * A formal hearing, with your subsequent decision based on the record thereof, might cure the constitutional infirmity otherwise present." (All emphasis added.)

On May 21 Somerset again wrote the Director requesting a hearing (as it did also on May 28).

The Director on May 26, in replying to the long letter of March 26, said that he had received no application for a permit for the Bergdoll Tract but that if and when he did, he would advise Somerset, and added: "I never have, nor do I have any intent in the future of holding a public hearing on an application for a building permit."

On June 3 the Director telephoned Somerset's lawyer that a site development plan for a portion of the Bergdoll tract had been filed. On June 4 Somerset filed with the Department of Inspections and Licenses a petition which incorporated the March 26 letter by reference, reiterated Somerset's contention that a hearing was required, asked to be present when the Director and Funger had any discussion relative to the plan, advised the Director that Funger had never advised Somerset or otherwise indicated that the apartment house would be higher than fourteen stories and that "if the site development plans filed with your office show proposed apartment buildings taller than fourteen stories, the Town of Somerset will take express exception thereto * * *," and directed attention to a proposed amendment to the Zoning Ordinance then pending before the Council, under which the height of buildings within an R-H zone would be limited to seventeen or eighteen stories.

There followed on June 7 a similar and supplemental petition which advised the Director that the Mayor of Somerset, having been refused a copy of the site development plan, had gone to the Director's office and made a tracing of the site plan which shows a "west rear yard" with a setback of only 85 feet which, in light of the proposed height of the building, should be 262 feet, and a proposed garage extending above ground to a height of 20 feet which "would come within 110 feet of the

northern property line instead of adhering to proper side yard setback requirements." The further allegation was made that Somerset had:

> "not been given the opportunity to examine the plan in order to see if it complies with the many qualitative requirements or standards set forth in Section 104-13A pertaining to the R-H Zone, all of which must be taken into account by the Director in the written findings that he is required to make in the event that he disapproves the plan and with which the applicant must comply if the plan is to be approved."

The fourteen-story argument was again repeated and the allegation made that:

> "For the Director to approve buildings of that height [thirty stories] would be to aid and abet * * * [Funger] in a drastic breach of their agreement with the Town and the people of Somerset."

The relief prayed was the furnishing of a set of the plans, an opportunity to file written objections, a hearing and disapproval of a structure higher than fourteen stories, or 135 feet.

A second supplemental petition was filed on June 11, which said that:

> "One of the qualitative requirements which the Director must take into account in considering an application filed to construct apartments within the R-H Zone is that 'a maximum of safety' be provided 'for the residents of the apartments within the development.' In that connection, there is attached as Appendix I to this Second Supplemental Petition a statement filed with the Montgomery County Council on June 9, 1965, by counsel for the Town of Somerset, with Annexa 1-5 attached thereto, which discusses in detail the peculiar and significant risks of loss of life or injury to persons resulting in fires that break out in tall buildings. We incorporate by reference herein pages 3-6 of that statement and Annexa 1-4 attached thereto,"

and prayed, by reference, all the relief previously prayed.

A third supplemental petition was filed on July 14, which recited that Funger had formally filed a site development plan and applied for a building permit for an apartment house twenty-four stories or 210′ in height and that the Director had asked for approval of the County Department of Public Works, the State Roads Commission and other interested agencies, but had not asked permission of Somerset. It was then alleged that a building of 210′ in height did not comply with the "qualitative standards" prescribed by the Montgomery County Code pertaining to the location and height of buildings in an R-H zone, and the requirement that the plan achieve "a maximum of coordination between the proposed development and the surrounding uses," and the necessity that the proposed project provide a "maximum of safety" for "the residents of the apartments within the development." There was a further allegation that the north side yard of the apartment house was invaded, contrary to law, by an underground garage as shown on the plat, because the garage is a "building" or a "projection thereof," within the meaning of the definition of a side yard in the law. The third supplemental petition concluded by asking for disapproval of the site development plan and the refusal of a building permit "for the reasons set out in this Third Supplemental Petition."

The precise issue before us of whether the Director must afford a hearing to protestants before issuing a building permit is a narrow one for several reasons. First, it is one which will not recur. In February 1967 the Montgomery County Council amended the ordinance (Montgomery County Code (1965) Sec. 111-16) under which the permit in the present case was processed to provide that an applicant for "a building permit in an R-H Zone" must submit "a plan of development" to the Montgomery County Planning Board, and the Planning Board consistently holds a hearing before approving or disapproving a site development plan.

Second, a hearing was not required by the then applicable statute and, third, we are not concerned with the desirability of appropriateness of a hearing but only with whether the appellants were denied due process of law when they were not

afforded the opportunity to present orally their views as to why the permit should not be issued.

There are various concepts to the word "hearing." There is the "judicial hearing" (often called the trial-type hearing), which is to determine "adjudicative facts," at which evidence is offered of conflicting recollections of what happened or of a given situation.

There is little, if any, difference of opinion in the cases or among the commentators, that in this situation, if there is to be essential fairness, both sides must have the opportunity to present evidence and argue the inferences and the proper answers.

On the other hand, there is the situation where the facts are "legislative," and do not need judicial adjudication, but must be legislatively or administratively related to the controlling law. In this situation due process either does not require a hearing or requires no more than a consideration of arguments, and not necessarily oral arguments. 1 Davis, *Administrative Law Treatise,* §§ 7.02, 7.06, 7.07 (1958).

The legislative branch of the County government committed to the Director the implementation of the R-H zone legislation. He was to administer the law by considering facts revealed to him by the drawings and writings required to be submitted in each instance of development of an R-H zone and from them determine whether the site plan conformed to the letter—and to some extent the spirit—of the law as to requirements and purposes. In performing this legislatively delegated duty he did not perform a judicial function. The appellants seemingly recognized this for Somerset argued to the Director that he must hold "a legislative type, public hearing," at which those interested "would have the opportunity of presenting data, views and argument directed to the issues presented * * *."

We have held that where the official determination to be made is quasi-legislative or administrative, there is no constitutional need for a hearing. *Albert v. Pub. Serv. Comm'n,* 209 Md. 27; *Eliason v. State Roads Commission,* 231 Md. 257. *See also Bowles v. Willingham,* 321 U. S. 503, 88 L. Ed. 892 (1944) ; *Federal Radio Commission v. General Electric Co.,* 281 U. S. 464, 74 L. Ed. 969 (1930) ; *Bi-Metallic Investment Co. v. State*

*Board of Equalization,* 239 U. S. 441, 60 L. Ed. 372 (1915).

If an argument or legislative-type hearing is for some reason considered necessary, or is granted by statute, there would seem to be no constitutional reason why written or printed arguments only should not be sufficient, and the cases have so indicated. A hearing in an appellate court is an argument-type hearing and appellate courts, including the Supreme Court, can decide and often have decided important cases and issues on printed arguments without oral presentation. Davis, *op. cit.* § 7.07, p. 434: "* * * even in some of its most momentous action, the Supreme Court has sometimes denied opportunity for oral argument." *See Santa Clara County v. Southern Pacific Railroad,* 118 U. S. 394, 30 L. Ed. 118 (1886).

In the case before us, Somerset presented to the Director exhaustive and impressive written arguments on every point it felt (and now feels) was relevant and bore on the propriety of issuing the permit.

Finally, even if it be assumed that a hearing would have been required if the statutes offered no opportunity for further review of the Director's action, there was such an opportunity and the appellants availed themselves of it and thereby cannot successfully complain that they were constitutionally aggrieved. In *Albert v. Pub. Serv. Comm'n, supra,* we said, at pages 39-40 of 209 Md.:

> "Where the question has been a close one as to whether one process required a hearing in a given situation, the fact that a court review was afforded has been held to swing the decision to the side where no hearing is necessary. See, for example, *Bowles v. Willingham, supra* [321 U. S. 503, 88 L. Ed. 892]; *Hall v. Geiger-Jones Co.,* 242 U. S. 539, 61 L. Ed. 480; *Porter v. Investors Syndicate,* 286 U. S. 461, 76 L. Ed. 1226; *Prata Undertaking Co. v. State Board of Embalming & Funeral Directing,* (R. I.), 182 A. 808,"

and in *Burke v. Fidelity Trust Company,* 202 Md. 178, 188, we said:

> "Moreover, due process does not necessarily mean judicial process. It is sufficient if there is at some stage

an opportunity to be heard suitable to the occasion and an opportunity for judicial review at least to ascertain whether the fundamental elements of due process have been met. *Anderson National Bank v. Luckett*, 321 U. S. 233, 246, 64 S. Ct. 599, 88 L. Ed. 692; *Hardware Dealers Mutual Fire Ins. Co. v. Glidden Co.*, 284 U. S. 151, 159, 160, 52 S. Ct. 69, 79 L. Ed. 214."

*Cf. Fulker v. County Comm'rs,* 156 Md. 408, and *Appelstein v. Baltimore,* 156 Md. 40. *See also* Davis, *op. cit.* § 7.10.

The appellants argue that they had to go before the Board and the Circuit Court bearing the burden of overcoming the presumption of the correctness of the Director's action. The ordinance which grants the right of review by the Board, § 104-22 (a) and § 104-25 (a) of the Montgomery County Code (1960), does not speak of burden of proof. It is under these statutes and its own rules of procedure that the Board decides whether there was error on the part of the Director, and to this end holds what amounts to a trial-type hearing at which evidence is presented and which concludes with a decision made by resolution which must contain "a statement of facts found and the grounds for its decision." The appellants presented to the Board expert opinion testimony and other evidence to show that the Director had been wrong in approving the site plan. The full opportunity to present their side of the controversy before the Board, followed by judicial review, strips the appellants of any just claim of constitutional deprivation.

The appellants have found no sound ground on which to support their claims that (a) the Director did not consider or follow the requirement that the site plan must achieve a maximum of coordination with surrounding uses and the requirement of preventing detrimental effects to adjacent properties and the general neighborhood; (b) the north side yard violated the minimum setback requirements; and (c) commercial facilities which the ordinance prohibited were shown on the plan.

It is apparent that the claim of lack of coordination with surrounding uses and detriment thereto is based solely on the height of the proposed structures. Concededly, the appellants would have found them coordinated and non-harmful if they were to

be fourteen stories or less. The County Council, when it granted R-H zoning for the tract involved, necessarily found that the location was suitable for high rise apartments without limitation as to height (as we found in *Funger,* 249 Md. 311), and that the setback and open space requirements would offer the needed protection for adjoining areas and residents. The appellants have not shown, nor do they claim, any special topographic situation, unusual location of nearby buildings or other special circumstances which would require disapproval of the site plan because the apartment house to be built on it was 210 feet high. The appellants' gripe is that they do not want a tall building near them, not that a tall building there violates the law.

The Director is not required, as appellants would have us believe, to make a separate factual finding that there is a "maximum of coordination" between the proposed development and surrounding buildings and uses. The ordinance states that the Director shall consider the standards and purposes of the ordinance "with a view to achieving" a maximum of coordination. This the Director testified he had done. He said that he had, to the best of his ability, considered whether the proposed plan of development attained "a maximum of coordination between the proposed development and the surrounding uses." He considered the setbacks, ground coverage, green space, off-street parking, height, light and air, means of ingress and egress, safety of residents of the apartments, conservation of woodland and protection of water courses from erosion and siltation. He added that although the R-H zoning indicated compatibility with the surrounding uses, he still had to insure that the development complied with the ordinance requirements and, implicitly, that there were no unusual or special circumstances present.

He pointed out that the Department of Public Works, the State Roads Commission, the Washington Suburban Sanitary Commission, and the Maryland National Capital Park and Planning Commission had approved the site development plan. Clearly, the Board and the court were justified in finding against appellants on this point.

We find no need to review elaborately the correctness of the Director's conclusion that the north side yard met the setback

requirements of the R-H ordinance. The plan showed an underground garage, over which was a swimming pool (permitted by the ordinance in a yard) between the north end of the apartment house and the northern property line. Because the ground level had been built up some twenty feet, with a 1' 9" retaining wall to permit the garage to be constructed underground, the appellants say the surface area cannot be computed as a side yard. The Director said that such an underground structure is usual and is permissible under a side yard. A yard is defined (Montgomery County Code (1960) Sec. 104-2) as:

> "Open space on the same lot with a building or group of buildings, lying between the building or outer building of a group and the nearest lot or street line, and *unoccupied and unobstructed from the ground upward,* except as provided in this ordinance." (Emphasis added.)

We think the Board and the court did not err in upholding the Director on this point.

On the point of commercial uses, the Circuit Court found, permissibly, we think, that:

> "The contention that the Board erred when it sustained the Director's approval of a site plan showing space designated for commercial use is without merit. The testimony of the Director before the Board * * * states that no application for commercial use had been filed and that if one was filed a permit would not be granted inasmuch as the site of the apartment building is less than 20 acres and cannot qualify for commercial uses. There is no designation of a commercial use on the site plan before the director for his consideration at the time he issued the excavation and foundation permit, the subject of this appeal."

The appellants were not constitutionally or legally aggrieved by the issuance of the permit which so irks them.

*Order affirmed, with costs.*