## FUNGER, ᴇᴛ ᴀʟ. *v.* MAYOR AND COUNCIL OF THE TOWN OF SOMERSET, ᴇᴛ ᴀʟ.

[No. 199, September Term, 1967.]

*Decided March 22, 1968.*

The cause was argued before HAMMOND, C. J., and HOR-NEY, MARBURY, BARNES, McWILLIAMS and SINGLEY, JJ.

*Norman M. Glasgow,* with whom were *Wilkes & Artis, George H. Clark, Whayne S. Quin* and *Carl Lee Frederick, Jr.* on the brief, for appellants.

*Alfred L. Scanlan,* with whom was *Shea & Gardner* on the brief, for appellees.

SINGLEY, J., delivered the opinion of the Court.

The troubles which the appellants, Mr. Morton Funger and his business associates (hereafter referred to as "Community Builders" or "Community"), have had with the Town of Somerset (the Town), *Funger v. Mayor and Council of Town of Somerset,* 244 Md. 141, 223 A. 2d 168 (1966); *Chevy Chase Village and Town of Somerset, Maryland v. Montgomery County Board of Appeals,* 249 Md. 334, 239 A. 2d 740 (1968), have occupied almost as much of this Court's attention as did the difficulties which the Prince de Bearn had with his father-in-law.[1]

It all started simply enough. Somerset, located in Montgomery County, Maryland, is an independent municipality, incorporated in 1906.[2] The Town, which covers some 220 acres, lies generally to the west of Wisconsin Avenue, immediately northwest of the District of Columbia line. There are some 400 single-family homes in Somerset, the entire Town being zoned R-60,[3] except for the tract which is the subject of this controversy, and one other tract of 2 acres, both of which are zoned R-H.[4] The median income of the residents of the Town is $17,-700; the median value of the residences, $34,000, with some selling for as much as $60,000. Mr. Warren Jay Vinton, Somerset's mayor, and himself a planner of some reputation, describes Somerset as "an upper middle class community. Citizens appear to love it, and want to defend it, and they appear to be relatively happy in the Town. No house ever comes for sale in the Town but what it is snapped up within a few days."

Somerset had something else to recommend it. Within the Town limits and abutting on its southern and eastern boundaries lay the Bergdoll property, an undeveloped wooded tract of some 30 acres, traversed by a stream. This was not the sylvan idyll which it seemed, however. Situated just across the District of Columbia line, in the burgeoning Washington metropolitan area, the tract was ripe for development. The southeastern corner of the property is diagonally opposite the Chevy Chase store of

---

1. de Bearn v. Winans, 111 Md. 434, 74 A. 626 (1909); 115 Md. 139, 80 A. 730 (1911); 115 Md. 604, 80 A. 1071 (1911); 119 Md. 390, 86 A. 1044 (1913); 232 U. S. 719 (1914).

2. Montgomery County Code (1965), ch. 59.

3. One-family, detached residential, 6000 sq. ft. minimum area.

4. Multiple-family, high-rise planned residential.

Saks Fifth Avenue; to the south is a commercial area ringed with high rise apartments and office buildings. Some 20 years ago, there had been an abortive effort to have it rezoned for apartments, and 10 years ago the Hecht Company had sought commercial zoning, but had been persuaded to withdraw its application.

This was the situation in April of 1961 when Community Builders purchased the Bergdoll property for $1,100,000. On 31 May 1961, the purchasers filed an application for R-10 [5] zoning and this set off a barrage of legal artillery which has to this day illumined the horizons of the Montgomery County Council, the Circuit Court for Montgomery County and this Court.

Somerset opposed the R-10 zoning and to buttress its opposition, collected petitions signed by 1600 residents of Montgomery County. Community Builders struck their tents, and withdrew their application in November, 1962, without prejudice. On 30 November 1962, they countered with an application for R-H zoning for some 25 acres of the tract. After a town meeting, Somerset determined to oppose the application and to condemn a portion of the Bergdoll tract for park purposes. Following a hearing on 16 April 1963, the Montgomery County Planning Board recommended that the Maryland-National Capital Park and Planning Commission consent to the Town's acquisition of some 15 acres as a park.

It is not without significance that immediately after the 16 April 1963 hearing, the action was transferred from the administrative battleground to the negotiating table. The result and not the progress of two weeks of bargaining is important. On 30 April 1963, Community Builders wrote the following letter:

> "The undersigned as owners of the property described in the above application hereby agree, in consideration of the Town of Somerset, Maryland, recommending approval of 18.1906 acres of R-H zoning, that should such zoning be granted, they will enter into such agreement as may be appropriate to limit the development of such tract of land

5. Multiple family, high density residential (apartments). The density is comparable with the permissible maximum density of the R-H zone, but the regulations are less restrictive.

for a period of twenty years to a density equal to 16 acres of land zoned R-H based upon the regulations as of the date of the zoning change. All other rights permitted under the R-H zoning shall be applicable to the entire 18.1906 acres.

"It is understood that there is embraced within the aforementioned 18.1906 acres an area containing 2.1906 acres in which the Town of Somerset shall be granted a scenic and conservation easement for the benefit of the inhabitants of the Town of Somerset."

and at 7:40 A.M. on the day following, 1 May 1963, the Somerset Town Council adopted a resolution:

"RESOLVED by the Mayor and Council of the Town of Somerset that it is hereby recommended to the Montgomery County Council, sitting as the District Council, that it grant R-H zoning for a parcel of 18.1906 acres being a portion of the land which is the subject of Rezoning Application C-927. A plat of the said parcel of 18.1906 acres and its metes and bounds are attached hereto.

"In consideration of such recommendation, Community Builders, the owner of said land, shall, if such rezoning is granted, give the Town of Somerset a perpetual easement for scenic and conservation purposes of 2.1906 acres, being a strip approximately 85 feet in width along the western boundary of said parcel of 18.1906 acres. Community Builders shall, if such rezoning is granted, also enter into a 20 year covenant with the Town of Somerset to limit the development of the 18.1906 acres to the density and the uses permitted under R-H zoning for 16 acres only, in accordance with the regulations in effect on the date of the rezoning, if granted. All other rights permitted under R-H zoning shall be applicable to the entire 18.1906 acres subject to the above mentioned easement of 2.-1906 acres."

At this juncture, an agreement had been reached, the letter of 30 April constituting the offer, the resolution of 1 May, the acceptance: Community Builders were to seek R-H zoning for

18.1906 acres of the Bergdoll tract, and Somerset would rec- ommend [6] that the request be granted by the Montgomery County Council. In the event that rezoning were granted, Community Builders would: (1) Give Somerset a perpetual easement over 2.1906 acres "for scenic and conservation purposes"; (2) By covenant, agree that for 20 years the 18.1906 acres would be used only for purposes and uses permitted in an R-H zone as of the date of the zoning change [7] and agree that should R-H zoning be granted for the entire 18.1906 acres, density would be limited to that permitted for 16 acres.[8]

As is so frequently the case in armistice negotiations, there was another understanding, not exactly a secret covenant, but one which Community Builder's counsel wanted to be regarded as a "separate and distinct transaction." It was embodied in an undated letter which was delivered to Somerset on 30 April 1963:

> "The Town of Somerset and The Maryland National Capital Park and Planning Commission have indicated that a public park located within the Town of Somerset would benefit the residents of the community. It has also been indicated that property owned by the undersigned would be suitable for such purposes. In recognition of our community responsibilities we agree to provide such property as a donation for the public good as follows:
>
> "The undersigned hereby agree to donate two (2) acres of land as described in Exhibit A for use as a public park or for such other public purposes as may be deemed appropriate. We also acknowledge our intention to donate an additional eight (8) acres for the same purposes contiguous to the presently donated two (2) acres in four equal annual increments beginning in 1964.

---

6. Montgomery County Code (1965) § 70-89(d) would require a ⅔ majority of the district council to make such a zoning change contrary to the Town's recommendations.

7. There was testimony that this was intended to prevent commercial use, should the R-H regulations be changed.

8. 697 apartment units.

"In the event it is desired, at any time, to use for such purposes a part of the ten (10) acres that we intend to donate, we agree to lease the undonated balance of the ten (10) acres at an annual rental of $100.00 per acre.

"In order to assure you of the good faith nature of our pledge, we agree to provide such security as may be deemed appropriate to provide for the future donations as promised herein.

"The undersigned also agree to grant to the Town of Somerset an option to purchase a two (2) acre parcel averaging approximately 111.5 feet in depth running parallel to the rear lot lines of lots fronting on Dorset Avenue, as shown on the attached plat. Such right to purchase shall be available to the Town of Somerset up to December 31, 1963, and such purchase price shall be $125,000.00 per acre. If such purchase is consummated the owners will receive (in a form mutually agreed upon) Town Serial Bonds for the full purchase price running for 15 years at $3\frac{1}{2}$ per cent interest. Principal payments to begin 3 years from date of issuance.

"The undersigned has authority to sign on behalf of the owners of the parcel of land located in the Town of Somerset and known as part of the Bergdoll Tract."

This offer was accepted by the Council at its meeting on 1 May prior to the adoption of the resolution with respect to rezoning heretofore quoted, and the acceptance was confirmed by a letter from Mayor Vinton dated 25 May 1963.

There was great activity on 1 May 1963. After the early morning meeting of the Somerset Council, the parties met with Maryland-National Capital Park and Planning Commission, apparently to discuss the park aspects of the proposal, since the acquisition had to be approved by the Commission [9] and was, in fact, later approved. Then a visit was made to the Montgomery County Planning Board, which recommended R-H zoning for 18.2 acres.

9. Maryland Code (1966 Repl. Vol.) Art. 23A, § 9.

A public meeting of the Somerset Council was held on the evening of 6 May 1963, which was attended by some 125 citizens. The mayor described the result of the negotiations. The minutes reflect that "[a]fter a long discussion, the actions taken by the Mayor and Council on these matters were overwhelmingly approved * * *. A number of those who spoke * * * expressed their confidence in the Mayor and Council and extended their congratulations and thanks for a job well done."

A hearing on Community Builders' application for rezoning was held before the Montgomery County Council on 9 May 1963, and on 18 June 1963, the Council rezoned 18.1906 acres of the Bergdoll tract R-H.

Peace came, at long last, to the Town of Somerset. By letter of 25 May 1963, Mayor Vinton had formally accepted the gift of the park land. On 9 June 1963, Community Builders entered into an option agreement [10] by which the Town was given the right to purchase 2 acres of the unzoned portion of the tract for $250,000 and on the same day executed a deed conveying to the Town for park purposes the first of the five 2 acre parcels which comprised the remainder of the unzoned portion.

A new difficulty arose in December of 1963. Somerset had planned to issue town bonds to finance the purchase of the 2 acre tract on which it held an option. Frustrated by a taxpayer's suit which had been instituted on 10 July 1963, but had not been decided at the time when the option was about to expire, an arrangement was reached with Community Builders by which Community agreed to convey to the Town the 2 acres under option without the receipt of any consideration provided that the declaration of covenant be modified so that the computation of density would be based on 18.1906 acres instead of on 16, as had been originally agreed. Community confirmed this by letter of 1 April 1964, and on 4 May 1964, entered into a declaration of covenant, agreeing that the use and density limits to be applied in the development of the 18.1906 acre tract should, for a period of 20 years from 18 June 1963, be those in effect at that date.

---

10. Apparently never executed by Somerset.

The practical result of this modification was to increase from 697 to 793 the number of apartment units which Community could place on the 18.1906 acre tract and to increase from 10 to 12 acres the area which was to be conveyed to Somerset without cash consideration. The 2.1906 acre tract to be subjected to a perpetual easement for scenic and conservation purposes was left undisturbed.

On 29 June 1964, Community executed the deed creating the easement and an escrow agreement with Realty Title Insurance Company, under which there were deposited four deeds of gift, each conveying to Somerset a 2 acre tract, the first of which was to be delivered to the town on 9 June 1965; the second, on 9 June 1966; the third, on 9 June 1967; and the fourth, on 9 June 1968. It would appear that a deed for the 2 acre tract originally the subject of the option was also deposited under the escrow agreement, but the record does not disclose a date.

The peace which Community had purchased at a high price [11] was short-lived. Hostilities commenced again in December, 1964, when it first became known that the apartment building which was being planned was 30 stories high. According to Mayor Vinton, there was "[f]uror and commotion. The citizens of the town were indignant. They felt they had a representation from the builders to build a project of 12 or 14 stories' height, and a hue and cry was raised throughout the town * * *." The outburst of civic indignation led to the scheduling of a town meeting on 11 February 1965 at which the Community proposal was presented. A postcard poll was called for, with the following results:

> "Are you opposed to a building of 30 stories high; or not opposed?"
> "Opposed"     263
> "Not opposed or neutral"     41
> "Should the town resist actively in any legal manner it could the proposal for 30 stories?"
> "Resist actively"     256
> "Take no further action"     48

This was an unconditional declaration of war; Somerset and

---

11. By its calculations, 12 acres at $125,000 per acre, or $1,500,000.

Community Builders marshaled their forces, and preparations began for a major engagement on the forensic battlefield. First, however, the parties engaged in a series of tactical maneuvers. On 19 February, Mayor Vinton appeared before the Montgomery County Council in support of a proposal to impose a height limitation on buildings in an R-H zone. On 17 March, Somerset retained special counsel to represent the Town in the controversy. On 13 April, counsel for Community advised Realty Title Insurance, the escrow agent under the agreement of 29 June 1964, that no delivery was to be made of the four deeds of gift covering the 2 acre tracts, and that a return of the undelivered deeds would be sought. On 8 June 1965, there was introduced in the Somerset Council an ordinance limiting buildings to a height of 160 feet or 17 stories. On 9 June, Mayor Vinton, not knowing of the letter to Realty Title, asked for and received delivery of the third [12] deed; on 10 June, when Realty Title told him that the deed had been delivered in error and asked for its return, the mayor sent Mrs. Vinton to Rockville to record it. On 15 June the height ordinance was passed, effective 5 July 1965. On 12 June, Community had applied to the county for the approval of a site development plan and the issuance of a building permit for excavation and foundations for a 24 story apartment house. The plan was approved and the permit issued by the director of the Department of Inspection and Licenses of Montgomery County on 28 July 1965, despite protests filed by Somerset on 26 March 1965 and on 21 May and 28 May, before the application was filed and a petition for hearing filed 4 June, which was later supplemented.

On 29 July 1965, Community filed a complaint in the Circuit Court for Montgomery County for declaratory and injunctive relief, alleging that the Somerset height ordinance prevented it from constructing a building for which it had a valid permit and asked that the ordinance be declared invalid and that the Town be enjoined from enforcing it. The defendants answered and filed a counterclaim in which they sought either en-

---

12. While the record is not entirely clear in this regard, it would appear that a deed for one of the 2 acre parcels was delivered in 1964 when the parcel formerly under option was placed in escrow.

forcement of the escrow agreement or an injunction against the erection of a building more than 140 feet in height and damages in the amount of $2,650,000.

Now it was Community's turn. It filed a "plaintiff's counterclaim" which sought: 1. Rescission of the deed of easement, rescission of the declaration of covenant, and return of the 2 acre deeds held in escrow, or alternatively, $1,500,000 damages; 2. Reconveyance of the three 2 acre lots already conveyed, return of the 2 acre deeds held by the escrow agent, or alternatively, $5,000,000 damages; 3. Reconveyance of the easement, nullification of the declaration of covenant, return of the escrowed deeds, reconveyance of the three 2 acre lots, or alternatively, $4,000,000 damages. Somerset demurred to Community's counterclaim, and the demurrer was sustained as to all three counts.

The order sustaining the demurrer came to us on review in *Funger v. Mayor and Council of Town of Somerset*, 244 Md. 141, 223 A. 2d 168 (1966). We reversed, in an opinion filed 12 October 1966, and remanded the case to the lower court for trial.

On 27 February 1967, Somerset repealed the height ordinance[13] and on the following day, moved to dismiss Community's original complaint on the ground that the repeal of the ordinance made the complaint moot. On 15 May 1967, the court below granted the motion and dismissed the complaint. The case proceeded to trial on Community's "plaintiff's counterclaim." From an order dismissing the counterclaim and enforcing the escrow agreement, the present appeal was taken.

This wearying chronicle of events is necessary to an understanding of the problem which now confronts us.

Stripped of its complexities, the case before us presents three problems, not necessarily in order of difficulty:

---

13. Apparently as a result of the doubts of the Somerset Council as to the validity of the ordinance and of the mistaken hope expressed in our opinion in Funger v. Mayor of Somerset, 244 Md. at 153: "If it is ruled that the Town lacked power to pass the challenged ordinance limiting the height of structures within its borders—as to which we now express no opinion—the controversy would, except perhaps peripherally, come to an end."

1. What was the agreement between Community and Somerset?
2. Was there a breach of the agreement by either Community or Somerset?
3. What relief can be accorded the aggrieved party?

## 1.

We find that the agreement between Community and Somerset had two aspects:

(1) By its letter dated 30 April 1963, Community offered, in consideration of Somerset's recommending R-H zoning for 18.1906 acres (a) to limit the development of the tract for a period of 20 years to the density permitted on a tract of 16 acres "based on the regulations as of the date of the zoning change"; and (b) to subject 2.1906 acres to a scenic and conservation easement.

The resolution of the Town Council adopted on 1 May 1963 accepted this offer but clarified the reference to the regulations to be incorporated in the covenant, making clear that they related to both density and use.

Community's letter of 1 April 1964 offered to amend this agreement, and the resolution of the Somerset Council, adopted 2 April 1964, accepted Community's offer to convey the 2 acre tract which had been the subject of the purchase option.

Somerset performed the agreement by making the required recommendation to the County Council; Community, by executing the declaration of covenant on 4 May 1964; the deed of easement on 29 June 1964; and the deed of the 2 acre parcel formerly subject to option.

(2) The second aspect is found in Community's unilateral and unconditional offer contained in an undated letter (delivered, according to the testimony, on 30 April 1963) by which it agreed (a) to donate to Somerset 2 acres of park land immediately, and 8 additional acres, in annual "increments" of 2 acres each commencing in 1964; and (b) to grant an option to Somerset to purchase a 2 acre tract for $250,000 on or before 31 December 1963. The offer to convey 10 acres was accepted at a meeting of the Somerset Council on 1 May 1963 and con-

firmed by the mayor's letter of 25 May, the execution of the option was authorized by the Council on 6 May.

Community performed by executing the deed of 9 June 1963; [14] the escrow agreement of 29 June 1964; the four deeds dated 4 August 1964, deposited in escrow; and the option agreement of 9 June 1963.

If the story ended here, there would be no problem. As we understand the contentions of the parties, Somerset argues that Community Builders gained the Town's concurrence by representing that the construction of a 12 to 14 story building was contemplated. Community, on the other hand, maintains that Somerset, in recommending R-H zoning, gave tacit approval to the construction of any building which could be placed in an R-H zone under the regulations applicable on 18 June 1963 to a tract 16 acres (later changed to 18.1906 acres) in size.

For the resolution of this difference, we must look to the record and not to the text of letters written by Community and resolutions adopted by the Town Council, which are silent in this respect.

Somerset's argument is that the agreement with Community, while silent with respect to height limitations, must be interpreted in the light of extrinsic circumstances: First, the representation made to the Town Council on 6 July 1961, in connection with the application for R-10 zoning, that Community planned to build three 10 story apartment buildings. Second, the representation made at a meeting on 4 February 1963, prior to the application for R-H zoning, that the buildings would "probably be 12 stories." Third, that a plat prepared by Community's architects and dated 16 April 1963 showed a 125 foot setback line, which would be required for a building 125 feet in height. Finally, that a computation prepared by the architects on 22 April 1963 could be interpreted as contemplating two 14 story buildings containing 860 apartment units.

It should be emphasized, however, that all of this (excepting only the plat of 16 April 1963) was preliminary to the accord which was reached on 30 April—1 May 1963. This agree-

---

**14.** It is interesting to note that this conveyance was made before the R-H zoning was obtained.

ment, admittedly a compromise, was suggested on 17 April 1963 by J. Newton Brewer, Jr., Vice Chairman of Maryland-National Capital Park and Planning Commission and was discussed by the parties on 24 April 1963. With regard to the plat, which was exhibited at the time of the visits to the Maryland-National Capital Park and Planning Commission and the Montgomery County Planning Board on 1 May 1963 and incorporated in the record of the hearing before the County Council on 9 May, Community argues that at this time, the Town officials were preoccupied with the problem of protection, and that the plat was prepared on a "conservative" basis: i.e., to demonstrate the minimum separation which might obtain between the apartment structure and the nearest residences under any reasonable plan of development.

The testimony of Mayor Vinton, who has been mayor of Somerset since 1958 and is by no means inexperienced in problems of planning,[15] is of considerable significance. His description of the negotiations between Somerset and Community, insofar as they related to a restriction on building height, was as follows:

"Q. Does Defendants' Exhibit No. 3 [the resolution adopted at the meeting of the Somerset Town Council held on 25 April 1963] contain any reference whatsoever to the height of the building? A. No.

"Q. Was it discussed by the Town Council when they were preparing Exhibit No. 3? A. No.

\* \* \*

"Q. Was it discussed prior to the preparation of Exhibit No. 3? A. I don't believe that we ever discussed the height of the buildings in, with the idea of requiring that to be put in the covenant. We assumed

---

**15.** The record discloses that Mayor Vinton had been Field Research Supervisor for the Federal Housing Administration; Chief Economist of the Resettlement Administration; Chief Economist and Planning Officer of the F.H.A.; and First Assistant Commissioner of the Public Housing Administration. He is a member of the American Institute of Planners; an honorary life member and director of the American Society of Planning Officials; and a director of the National Housing Conference.

that [we] were going to get 12 or 14-story buildings, and didn't even put it in the covenant. I wish we had.

"Q. Mr. Mayor, you are here today in a dual capacity. You are an expert on planning as well as being the Mayor of the town. You are acquainted with the requirements of the R-H zoning; isn't that correct? A. Yes, sir.

"Q. When you and the town passed the resolution, * * * in which the Mayor and Town Council specifically approved—and I am reading from that resolution—'all other rights permitted under the R-H zoning shall be applicable to the entire 18.1906 acres subject to the above-mentioned easement of 2.1906 acres'— A. That's the way it reads.

"Q. I ask you, under that language, as an experienced planner, do you see any prohibition whatsoever restricting the plaintiffs as to the height of the building? A. Only the requirements of the R-H.

"Q. Only the requirements of the R-H? A. We did not specify the height of the building in our written documents.

"Q. Do you recall testifying before Judge Moorman on September 29, 1965, in which in response to the Judge's question you conceded that the town had made a big mistake in not including the height limitation? A. I said that on retrospect I wished we had put the height limitation which was the understanding by us into the covenant.

"Q. Do you recall stating and quoting that, 'When I make a mistake, it's a whopper'? A. I think I said something like that * * *."

Mayor Vinton's testimony lends support to the inference that he was not surprised by Community's proposal to construct a 30 story building. The announcement in the *Somerset Town Journal,* 1 December 1964, prepared under his direction, read, in part, as follows:

"Community Builders are now well advanced with preliminary plans for the 800 apartments they will

build on their portion of the Bergdoll tract, and have given us the following progress report.

"They state that it is their objective to make these apartments, set in their 18.26-acre site adjoining the Somerset Park, the most attractive and luxurious dwellings in the metropolitan area. After a long study of de luxe apartments in a number of cities, their architects, Corning, Moore, Elmore and Fisher, have recommended to Community Builders *that they take advantage of the provisions of the Zoning Code, which places no height limitation on buildings in the R-H zone,* provided they are set back from all property lines by a distance approximately equal to their height.

"The architects are now designing two apartment towers set near together and each about 30 stories in height * * *." (Emphasis supplied).

The next issue of the *Journal,* which appeared 2 February 1965, again under the *imprimatur* of the Mayor and Council, announcing the meeting called for 11 February 1965, continued in the same vein:

"As background, the Mayor and Council call attention to the fact that this land was zoned R-H (highrise apartments) by the County Council in June 1963, subsequent to a recommendation of such zoning by the Council of Somerset. Pursuant to this zoning, Community Builders have the right to construct 792 dwellings on this property, provided the area of land covered by buildings does not exceed 8% of the total. They are also legally permitted to construct buildings of a height equal to the distance by which their buildings are set back from their property lines.

"Community Builders have told the Mayor and Council that their preliminary plans (*which are in accordance with the provisions of R-H zoning*) call for a building with two 30-story towers and set backs of 270 feet. * * *

"*The Mayor and the five members of the Council wish to point out that the zoning to which the Town*

*has agreed is not in question, nor the legal right of Community Builders to proceed under its provisions. The Town has no legal power to impose any limitations on building heights other than those in the present zoning ordinance. Any other legal limitations on height could only come about by action of the County Council through an amendment to the zoning ordinance.*" (Emphasis supplied).

When asked to equate the items which appeared in the *Journal* with the position taken by Somerset after the meeting of 11 February, Mayor Vinton said, "We hadn't decided to get tough at that time," and when questioned about his apparent change of attitude, differentiated between his personal opinion ("the idea of towers like the Naval Hospital appealed to me") and his official position ("when the citizens, to whom I am responsible, voted overwhelmingly against it, I accepted that as a mandate to oppose.")

In our view, the evidence supported the conclusion that the agreement between Community and Somerset as ultimately amended was essentially this: If you (Somerset) will recommend R-H zoning for 18.1906 acres, we (Community) will subject 2.1906 acres to a scenic and conservation easement, will limit the development of 16 acres for a period of 20 years to the uses currently permitted in an R-H zone and to the density currently permitted for 18.1906 acres. We (Community) will also give you (Somerset) 12 acres of the tract for park land. This agreement was valid and was not contract zoning. *Greenbelt v. Bresler,* 248 Md. 210, 236 A. 2d 1 (1967).

At this point, some reference should be made to the transfer of 12 acres of park land. Somerset had pressed vigorously for the acquisition of a substantial portion of the Bergdoll tract for park purposes. The county authorities were sympathetic, but doubtful of the Town's ability to finance the purchase and of the wisdom of its attempting to do so. The suggestion that Community make a gift of the acreage was apparently Mr. Brewer's, and he and Community's tax counsel were anxious, for different reasons, that the gift be regarded as a transaction wholly separate and distinct from the application for rezoning. Com-

munity's counsel requested this separation; the Town agreed; the first 2 acre parcel was transferred on 9 June 1963, before the County Council approved the rezoning on 18 June; all of the deeds except the 1963 deed were designated as "deeds of gift"; and the three deeds recorded by the Town, including the deed recorded on 10 June 1965, were recorded as transfers without consideration, and therefore exempt from transfer tax. After the Town meeting of 11 February 1965, when Somerset determined to oppose Community's plans, the separation concept commenced to erode. On 12 February 1965, Mayor Vinton was visited by a representative of the Internal Revenue Service, and while there was a disagreement as to what transpired at this conference, it is clear from the mayor's testimony that he, at least, after 12 February regarded the offer to convey park land as a part of the consideration for the agreement. While we are not deciding this point, we will accept the mayor's contention which Somerest has adopted in its brief, for the purposes of this opinion.

It was a natural corollary to the understanding reached as to use and density that the parties intended that Community should be entitled to erect any structure permitted in an R-H zone in Montgomery County. Since it is conceded that there was no limitation on the height of such structures, Community was not prohibited, under its agreement with Somerset, from erecting a 30 story building if otherwise in compliance with the Montgomery County Building Code.[16]

### 2.

Moving forward from our delineation of the terms of the agreement, we find no indication of a breach by Community Builders, which performed its side of the bargain fully.

Somerset lays great stress on the letter sent by Community to the escrow agent on 13 April 1965, directing that delivery of deeds to the 2 acre parcels be withheld. This, however, was *after* the Town meeting of 11 February, the mayor's appearance before the Montgomery County Council on 19 February

---

16. Montgomery County Code (1965) ch. 79. The power to regulate building is reserved to the county by Montgomery County Code (1965) § 2-24.

and the employment of special counsel on 17 March. By then, the course of action which the Town intended to pursue was clear.

The posture assumed by Somerset was quite different. The Town, commencing on 11 February 1965, embarked on a course of action designed to frustrate Community in the exercise of its rights. Briefly stated, this was: (a) the employment of special counsel; (b) the effort to persuade the Montgomery County Council to impose a height limitation in R-H zones, culminating in Mayor Vinton's participation in a hearing before the Council on 19 February 1965; (c) the introduction and passage of the ordinance imposing the 160 foot height limitation; and (d) the attack on the validity of the building permit issued Community by Montgomery County, which ultimately reached this Court in *Chevy Chase Village and Town of Somerset v. Montgomery County Board of Appeals, supra.* We do not mean to intimate that questioning the validity of the building permit, taken alone and for good reason, would have necessarily constituted grounds for rescission.

It is no answer to say that the efforts before the Montgomery County Council were fruitless, that the ordinance was repealed, and that the validity of the building permit was upheld. The simple fact is that Somerset, as a consequence of the multi-pronged attack it has mounted, has prevented Community, for a period of about three years, from going forward with a development program which it had every right to carry into effect, accounting from the zoning order of 18 June 1963. The damages which Community has sustained, while not capable of precise computation, have far exceeded the risks inherent in the usual real estate operation, taken as a matter of course by an experienced developer.

There is a clear analogy between the case before us and the cases which hold that hindrance by one contracting party which impedes or prevents performance by the other constitutes a breach. Corbin, *Contracts* §§ 770, 947 (1960); 5 Williston, *Contracts* §§ 1293A, 1318 (Rev. Ed. 1937).

*Restatement, Contracts* § 315 (1932), states the rule:

"Prevention or hindrance by a party to a contract
of any occurrence or performance requisite under the

contract for the creation or continuance of a right in favor of the other party, or the discharge of a duty by him, is a breach of contract * * *."

In *Levin v. Perkins,* 12 Wis. 2d 398, 107 N. W. 2d 492 (1961) plaintiffs were the licensors and the defendant the licensee of an exclusive 10 year dairy cream franchise. Under the terms of the franchise, defendant agreed to use only an ice cream mix specified by plaintiffs. The court held that while the licensing agreement did not so provide, it would imply that the mix would be sold at a reasonable price and in quantities sufficient to the defendant's needs and cited *Restatement, Contracts* § 315 in support of the proposition that hindrance of the defendant by controlling the price or quantity of the ice cream mix would constitute a breach of contract by the plaintiffs.

The decisions of this Court are in accord. As Judge (later Chief Judge) Alvey, speaking for the Court in *Black v. Woodrow,* 39 Md. 194 (1874) said at 215-16:

"It not infrequently occurs, that contracts on their face and by their express terms appear to be obligatory on one party only; but in such cases, if it be manifest that it was the intention of the parties, and the consideration upon which one party assumed an express obligation, that there should be a corresponding and correlative obligation on the other party, such corresponding and correlative obligation will be implied. Thus, if the act to be done by the party binding himself can only be done upon a corresponding act being done or allowed by the other party, an obligation by the latter to do or allow to be done the act or things necessary for the completion of the contract will be necessarily implied."

This language was quoted with approval in *Milske v. Steiner Mantel Co.,* 103 Md. 235, 249, 63 A. 471 (1906).

Judge (later Chief Judge) Henderson, speaking for the Court in *Alois v. Waldman,* 219 Md. 369, 375, 149 A. 2d 406 (1959) restated the rule:

"It is well settled that, where cooperation is necessary

to the performance of a condition, a duty to cooperate will be implied, and that a party owing such duty cannot prevail if such failure operates to hinder or prevent performance of the condition. See Restatement, *Contracts,* § 315 (1) and § 395, Comment c; Williston, *Contracts* (Rev. Ed.) §§ 1293, 1293 A. Cf. *Black v. Woodrow,* 39 Md. 194, 215; *Milske v. Steiner Mantel Co.,* 103 Md. 235, 249; *Vanadium Corporation v. Fidelity & Deposit Co.,* 159 F. 2d 105, 108 (C.C.A. 2d); *Griffith v. Scheungrab,* 219 Md. 27, 34."

*See also, Livingston v. Green Prop., Inc.,* 222 Md. 354, 357-58, 160 A. 2d 594 (1960).

Admittedly, the typical case in this area is that of the landowner who contracts for the sale of timber, and then refuses to permit it to be cut, or contracts for the construction of a house, and then refuses to let it be built.

The applicability of the rule is not necessarily so limited, however, as indicated by *Vanadium Corporation v. Fidelity & Deposit Co.,* 159 F. 2d 105 (2d Cir. 1947). That case involved a contract for the sale of mining leases which required the approval of the Secretary of the Interior. The seller gave bond to the purchaser to secure the repayment of the purchase price in the event that the requisite approval was not obtained. Since the purchaser caused the approval to be withheld, the Court concluded that there was a breach of the implied condition to cooperate and the purchaser was denied recovery on the bond. The case at bar is not essentially different. Somerset agreed to recommend R-H zoning. In return, according to Somerset, it got the scenic easement, the declaration of covenant, and 12 acres of park land. In the language of *Black v. Woodrow, supra,* a corresponding or correlative obligation to cooperate, or at the very least, not to hinder, can be implied. Somerset obligated itself not to frustrate Community in the exercise of the rights which it acquired when its property was zoned R-H.[17] In our view, Somerset's failure to perform constituted a substantial breach of contract, entitling Community to seek rescission.

---

17. Somerset makes the point that by letter 12 November 1964 it attempted to reserve the right to oppose an application for special exception or variance. Neither is here involved.

### 3.

In our earlier consideration of this case in *Funger v. Mayor of Somerset*, 244 Md. 141, 223 A. 2d 168 (1966) we indicated that Community's counterclaim seems to lie solely in rescission with alternative claims for either return in specie or its equivalent money value, and we adhere to this view. We also reaffirmed the general rule that one who seeks to rescind a contract or to have equity rescind it must restore to the other party the consideration that was given by that party, *Restatement of Restitution* §§ 65 and comment e, 66 (1937), but pointed out that in certain circumstances, equity may order rescission without restitution. 5 Williston, *Contracts* § 1530 (Rev. Ed. 1937); *Restatement, Contracts* §§ 480-81 (1932); 3 Black, *Rescission and Cancellation* §§ 616-27 (1929); 17A C.J.S. *Contracts* § 438, (1963); 12 C.J.S. *Cancellation of Instruments* § 44(b) (1938); 17 Am. Jur.2d *Contracts* §§ 513-14 (1964); 13 Am. Jur.2d *Cancellation of Instruments* § 38 (1964). We also indicated that this Court has recognized the exceptions to the general rule of restoration and has applied some of them. *Findlay v. Baltimore Trust Co.*, 97 Md. 716, 55 A. 379 (1903); *Gaver v. Gaver*, 176 Md. 171, 4 A. 2d 132 (1939).

As we said in the first *Funger* case, Community might have maintained that it could have been granted R-H zoning without the recommendation given by the Town of Somerset. If this could have been established, then the promise to recommend rezoning might have been without effect or value. Additionally, Somerset should have known that once the rezoning was granted by a public body not subject to the control of Community or of Somerset, Community could not proffer a return of the Bergdoll tract to its prior status. Here we have two of the instances cited by Williston as examples of cases where equity will order rescission without restoration: The performance of the one against whom rescission is sought has become worthless, or the respondent has caused restoration to be impossible.

We need not reach this point, however, since it is our view that equitable considerations demand that Community must make an earnest endeavor to return both parties to the situation which existed at 29 April 1963, if the rescission it seeks is to be decreed.

The chancellor below should have entered a decree requiring Community to file, with the appropriate public body, an application for the rezoning of the entire tract as R-60, and to pursue this effort in good faith and with reasonable diligence, this action to be a condition precedent to the entry of further orders holding the deed of easement to be null and of no effect; voiding the declaration of covenant and the escrow agreement; directing the return of the deeds held by the escrow agent, and the reconveyance by Somerset of the tracts to which it holds title.

*Decree reversed, case remanded for entry of decree framed in accordance with this opinion. Costs to be divided equally between the appellants and the appellees.*