MONTGOMERY COUNTY, MARYLAND ET AL. *v.*
WOODWARD & LOTHROP, INC. ET AL.

[No. 104, September Term, 1976.]

*Decided July 15, 1977.*

688

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE and ORTH, JJ.

*Richard E. Frederick, Assistant County Attorney,* with whom was *Richard S. McKernon, County Attorney,* on the brief for Montgomery County, Maryland, part of appellants.

*Roger W. Titus* for Citizens Coordinating Committee on Friendship Heights, Inc. et al., part of appellants.

*William S. Green,* with whom were *Pierson, Ball & Dowd* and *Richard M. Singer* on the brief, for Special Taxing District of Friendship Heights and The Hills and the Friendship Heights Village Council, part of appellants.

*Norman M. Glasgow,* with whom was *John F. McCabe, Jr.* on the brief, for Morton Funger et al., part of appellees.

*Stephen Z. Kaufman,* with whom was *Joseph P. Blocher* on the brief, for Sidney S. Zlotnick et al., Homer S. Gudelsky, Trustee and The Marina Apartments, Inc., part of appellees.

Submitted on brief by *Howard J. Thomas,* with whom were *Charles R. Donnenfeld, Arent, Fox, Kintner, Plotkin & Kahn* for Woodward & Lothrop, Inc. et al. and by *George H. Beuchert, Jr.,* for The Chevy Chase Land Company of Montgomery County, Md. and by *William M. Canby,* for Gevco Company, Inc. et al., part of appellees.

*Amicus curiae* brief filed by Prince George's County, Maryland, *James C. Chapin, County Attorney, Michael O. Connaughton, Deputy County Attorney* and *Steven M. Gilbert, Associate County Attorney,* on the brief.

MURPHY, C. J., delivered the opinion of the Court.

These appeals draw into question the validity of a rezoning by sectional map amendment of all properties within the Central Business District of Friendship Heights, Montgomery County, Maryland.

The Regional District Act, Maryland Code (1957, 1976 Cum. Supp.) Art. 66D, § 8-101 (b) grants zoning power to the Montgomery County Council, sitting as a District Council (the Council) for that portion of the Maryland-Washington Regional District lying within the county, to regulate by ordinance, *inter alia* (1) the location, height, bulk, and size of buildings, (2) the size of lots and other open spaces, (3) the density and distribution of population, and (4) the location and uses of buildings and

land.[1] In the exercise of this power, the Council is authorized to divide the Regional District within the county "into districts and zones of whatever number, shape or area it may determine." Art. 66D, § 8-102. The zoning powers vested in the Council have been implemented by enactment of the Montgomery County zoning ordinance (the zoning ordinance), Montgomery County Code (1972), ch. 59, §§ 59-1 through 59-209. In addition to the text provisions of the zoning ordinance, the adopted zoning map for that portion of the Regional District located in Montgomery County is expressly made a part of the ordinance by § 59-33. Section 59-205 authorizes amendments to the text of the zoning ordinance. Section 59-195 authorizes amendments to the zoning map; it provides that an application for amendment of the zoning map may be in the form of:

"(a) A local [piecemeal] amendment covering a single tract, all portions of which are proposed to be classified in the same zone; or all portions of which are proposed to be classified in one of two alternative zones.

"(b) A sectional plan amendment covering a section of the Maryland-Washington Regional District, portions of which may be proposed to be classified in different zones.

"(c) A district plan amendment covering the entire Maryland-Washington Regional District within the county."

Section 59-196 provides that proposals for a sectional or district plan map amendment may be made only by the Maryland-National Capital Park and Planning Commission (the Planning Commission) or by the Council.

(1)

The Central Business District (CBD) of Friendship Heights is one of five such districts in Montgomery County

---

1. The Regional District encompasses, with minor exceptions, all land in Prince George's and Montgomery Counties. *See* New Carrollton v. Belsinger Signs, 266 Md. 229, 292 A. 2d 648 (1972).

authorized by § 59-50 (b) (1) of the Montgomery County Code (1972). It encompasses the entire political subdivision known as the Special Taxing Districts of Friendship Heights and The Hills.[2] Located on the boundary line between the county and the District of Columbia, it is bordered by Wisconsin and Western Avenues and lies generally north of the District of Columbia, west of the Village of Chevy Chase, and south of the Town of Somerset. The Friendship Heights CBD is compact and intensely developed; within its borders is a mixture of residential, office, and commercial development consisting of a number of high-rise, high-density apartment houses and hotels, office buildings, retail shopping centers, including several department stores, and some single family residences. It has been aptly described as an urban crossroad, a business center both local and regional in scope, with buildings of "Manhattan-like" proportions. It is a major transportation center in the county and a rapid rail (Metro) transit station is scheduled for construction at the intersection of Wisconsin and Western Avenues by late 1980. The Friendship Heights CBD is virtually surrounded by single family residential neighborhoods located immediately outside of its eastern, western and northern boundaries. Population in 1972 within the CBD was almost 3,000 persons. Prior to May 28, 1974, the Friendship Heights CBD was comprised of a land area totalling 62 acres. Existing zoning within the CBD at that time was primarily high density commercial, C-2 (General commercial), with some R-CBD (Multi-family, residential). No floor area ratio (FAR) limits were imposed by this zoning, which allowed a maximum height of 110 feet with provision for additional floors, upon compliance with certain conditions, up to 143 feet.

On May 28, 1974, the Council amended the text of § 59-50 (b) (1) of the zoning ordinance by reducing the size of the Friendship Heights CBD to 37.51 acres and realigning its boundaries. Thereafter, on July 16, 1974, the Council adopted Resolution 7-1849 granting Sectional Map

---

**2.** Montgomery County Code (1972), ch. 66, § 66-1. *See also* Friendship Heights v. Funger, 265 Md. 339, 289 A. 2d 329 (1972).

Amendment Application F-947 to the zoning ordinance, which implemented an adopted "Sector Plan" for the Friendship Heights CBD. The sectional map amendment rezoned a total of 41.01 acres of land, comprising all property within the revised CBD and a 3.50-acre parcel of land immediately outside its boundaries. It assigned new zoning classifications to all properties within the CBD which regulated the height, area and use of permissible development and thereby sharply reduced the densities and floor areas that could be built.

Ten aggrieved property owners whose properties had been downzoned by the sectional map amendment appealed to the Circuit Court for Montgomery County, as authorized by Maryland Code, Art. 66D, § 8-105. The issues being similar, the cases were consolidated for hearing and oral argument extended over a four-day period. On July 15, 1976, Judge H. Ralph Miller, in a thorough and studious memorandum opinion and order, reversed the Council's resolution granting the sectional map amendment on the ground that the procedural rights of the property owners to cross-examine witnesses at the sectional map amendment hearings before the Council, and to be afforded sufficient time to present evidence at those hearings, had been violated. Appeals were filed from this judgment to the Court of Special Appeals by Montgomery County, the Citizens Coordinating Committee of Friendship Heights, the Special Taxing Districts of Friendship Heights and The Hills, and the Friendship Heights Village Council, all parties to the proceedings below (hereinafter the appellants). The property owners (hereinafter the appellees) filed cross-appeals, contending that the lower court erred in concluding (1) that the sectional map amendment constituted comprehensive, rather than local or piecemeal, rezoning; (2) that the Council and the Planning Commission had acted within their statutory authority in adopting the Sector Plan for the Friendship Heights CBD upon which the sectional map amendment was based; and (3) that the sectional map amendment did not constitute either conditional zoning, a "confiscation" of property, or a violation of the uniformity requirements of

the zoning ordinance. We granted certiorari prior to decision in the cases by the Court of Special Appeals. *See* Maryland Code (1974) Courts and Judicial Proceedings Article § 12-201.

(2)

The appeals have spawned a massive 12-volume record extract totalling almost 5,000 pages. Briefs filed by the parties collectively exceed 365 pages. A review of matters underlying adoption of the Sector Plan for the Friendship Heights CBD, upon which the sectional map amendment is based, is essential to a proper understanding of the issues raised by the parties.

Maryland Code, Art. 66D, § 7-108 authorizes the Planning Commission, with the approval of the Montgomery County Council, to adopt both a General Plan for the physical development of the Regional District and a local Master Plan for each planning area in the county. Pursuant to this authority, a General Plan was adopted on January 22, 1964 for Montgomery and Prince George's Counties entitled "On Wedges and Corridors." It called for high density urban development along major transportation corridors in Montgomery County and preservation of the areas between the corridors (the wedge area) for low density development, buffers, parks and recreational areas. It envisioned the creation of five central business districts in Montgomery County, one to be located in Friendship Heights — the urbanized base of the northwest corridor in the county. The General Plan recognized that existing commercial zones were inadequate, particularly for complex business centers and it warned against too intensive development within urban areas. It noted that the presence or absence of utilities can determine where urban growth will occur and observed that excessive development could aggravate strained street systems and water and sewerage resources. The General Plan characterized itself as a "dynamic instrument rather than a finished product"; it stated that while its goals and major patterns were firm, "its details must evolve and develop." It called for the development of local area plans in

Montgomery County, noting that such plans "will be of utmost importance in preparing sectional zoning map amendments which will form the basis for properly controlling the sequence of development, as well as for solving local land use, transportation and public service problems." It also noted a need for "specific project plans" to deal with "[s]pecific small-scale problems . . . such as revitalizing a business district . . . [which will] require very detailed project planning."

In conformity with the recommendation of the General Plan, a local Master Plan for the 22-square-mile Bethesda-Chevy Chase Planning Area (the B-CC Master Plan), of which Friendship Heights was a part, was adopted in 1970. It projected considerable growth for Friendship Heights, both in the Maryland and District of Columbia portions, and indicated that such growth would likely intensify with the anticipated opening of a rapid rail (Metro) transit station in Friendship Heights. The B-CC Master Plan recommended that allowance be made for the orderly expansion of the Friendship Heights CBD, consistent with the need for open space; that parking requirements be diminished in the CBD; and that surrounding single family residential neighborhoods be protected. It also called for more detailed study of proposed land use and facilities within the CBD, and recommended that a "detailed development plan" be prepared for the entire Friendship Heights area, including both the Maryland and District of Columbia portions. Finally, it called for the creation of new commercial zones to assure the adequate development of CBDs in the county.

On June 22, 1971, the Montgomery County Council enacted Resolution 7-270 creating a Citizens Advisory Committee (the Blue Ribbon Committee) "To Study Zoning In Central Business Districts And Transit Station Areas" throughout the county. The resolution recited that "patterns of development are changing in high density areas of the county and in areas which will be affected by the advent of a rapid rail system"; the resolution expressed a need to develop new zones and revise existing zones in order to

encourage the development of mixed use and relatively high density centers of residential, commercial and office activities in the CBDs while at the same time protecting existing residential neighborhoods from the impact of such development. Shortly after the creation of the Blue Ribbon Committee, the Planning Commission appointed an Advisory Committee for the specific purpose of assisting it in preparing a detailed development plan for Friendship Heights as recommended by the 1970 B-CC Master Plan.

The Blue Ribbon Committee recommended to the Council that three new and more restrictive zoning categories be adopted for CBDs in the county — CBD-1, CBD-2, and CBD-3, each containing a standard and optional method of development. The Committee recommended that these zones replace all others then authorized within the CBD, and that detailed, short-range (6-to-10-year) plans, to be known as "Sector Plans," be adopted as amendments to the applicable Master Plans for CBDs in each planning district in the county.[3]

The Planning Commission, with the assistance of the Advisory Committee, prepared a "Preliminary Sector Plan for the Central Business District of Friendship Heights" in December of 1972. Centered on the proposed Friendship Heights rapid transit station, it encompassed the entire geographic area of the CBD, and included the "immediate environs" of Friendship Heights, a total of approximately 78 acres; it also took into consideration matters relating to the

3. In its report, the Committee recommended, and the Council adopted, an amendment to the zoning ordinance, which defined the term "Sector Plan" as follows:

"Comprehensive plan for a portion of a master plan area, showing in detail such planning features as type, density and intensity of land uses, pedestrian traffic features, public facilities (parking structures, public open space, rapid transit station, community service provisions and the like), and relationship of the various uses planned to transportation, services and amenities within the area of the sector plan and, where appropriate, to other areas. The sector plan may include maps, graphics and text, and is designed as the sector plan for the area which it encompasses. It may be adopted either as a part of a new area master plan or as an amendment to an existing master plan." See County Code (1972, 1975 Cum. Supp.) § 59-1.

Town of Somerset and Chevy Chase Village, adjacent to the CBD. The Preliminary Sector Plan purported to be an amendment to the B-CC Master Plan, refining and implementing the policy objectives outlined in that plan, viz., (1) to provide for the orderly development of the CBD "at a scale which can be tolerably balanced against the constraints imposed by a seriously limited feeder road system," (2) to utilize new zoning tools to accomplish that end, (3) to preserve and protect the residential neighborhoods adjacent to the CBD, and (4) to undertake public improvement programs and enact zoning changes required to support the proposed planning objectives. The Preliminary Sector Plan stated that the amount of development within the CBD must be related to the ability of the existing feeder road system to serve the CBD; it noted, however, that these roads could not be significantly improved except at unacceptable financial and environmental costs. It concluded that traffic on feeder roads was a primary constraint on the amount of development that was feasible in Friendship Heights. It said that if development within the CBD were to occur at the scale and intensity permitted by existing zoning, the feeder road system would become impacted to an intolerable degree. The Preliminary Sector Plan also referred to environmental and other constraints upon development within the CBD. It, therefore, recommended a substantial reduction in the amount and intensity of development within the CBD, adoption of the more restrictive CBD zoning categories recommended by the Blue Ribbon Committee, and a reduction in the size of the CBD itself.

Public hearings were held on the preliminary Sector Plan before the Montgomery County Planning Board (the Planning Board) of the Planning Commission for five days in February and March of 1973. Almost 100 witnesses appeared and a transcript of over 1,300 pages was assembled, together with a large amount of documentary material.

On September 4, 1973, the Council adopted the new and more restrictive CBD zones (standard and optional method

of development) recommended by the Blue Ribbon Committee.[4] Thereafter, in October of 1973, the Planning Board, having studied the record made at the public hearings on the Preliminary Sector Plan, adopted a Final Draft Sector Plan, which it transmitted to the Council. Public hearings were held by the Council over a three-day period in February of 1974 on the proposal to adopt the Plan, together with a proposed text amendment to § 59-50 (b) (1) of the zoning ordinance to reduce the size and realign the boundaries of the Friendship Heights CBD. A total of 76 witnesses appeared at these hearings and a transcript of over 550 pages was amassed. Numerous written documents were received into the record, as well as the entire record of the five public hearings held on the Preliminary Sector Plan.

At the public hearings before the Planning Board and the Council on the Preliminary and Final Draft Sector Plans, considerable evidence, both testimonial and documentary, was adduced relating to traffic constraints upon development within the Friendship Heights area. There was testimony that the amount of traffic generated by various existing developments in Friendship Heights caused hopeless congestion of the feeder road system. There was also contrary testimony that the feeder road system was not congested and could accommodate higher amounts of traffic. There was evidence relating to a severe air pollution problem in Friendship Heights, generated in part by automobile exhaust pollutants from the high volume automobile traffic. There was evidence that the sewerage system serving Friendship Heights was operating in excess of safe capacity and as a consequence raw sewage was being discharged into the Potomac River. There was evidence that there was almost a total lack of open space or green area within the CBD and that the scale and intensity of development in such a small area caused traffic congestion, inadequate parking, aggravating noise, and visual pollution.

The Council held five work sessions in early 1974 on the Final Draft Sector Plan, approving it, with modifications,

4. Montgomery County Code (1972, 1975 Cum. Supp.), ch. 59, §§ 59-51.3, .4, and .5; §§ 59-31.2 and .3 (optional method of development).

together with the text amendment to § 59-50 (b) (1) of the zoning ordinance, on May 28, 1974.[5] In adopting the Sector Plan (the Adopted Sector Plan), the Council accepted the recommendations made in the Preliminary Sector Plan as to the existence and effect of traffic and environmental constraints on the amount of development which was feasible within the Friendship Heights CBD. With respect to traffic constraints upon development in Friendship Heights, the Adopted Sector Plan determined that Metro would serve Friendship Heights by late 1980 and that under the minimum acceptable traffic constraints at peak hours (so-called service level D), there would be a maximum of approximately 11,000 development-induced trips (evening peak hour vehicular trips originating in or destined to both the District of Columbia and Maryland portions of Friendship Heights) over and above through traffic trips and those trips to and from the proposed Metro station.

To implement the zoning recommendations contained in the Adopted Sector Plan, Sectional Map Amendment Application F-947 was filed on June 4, 1974 and a public hearing was scheduled for July 8 and 13, 1974. The Council advised all property owners within the CBD a week prior to the hearing that time limitations would be imposed for the presentation of oral testimony — eight minutes for property owners, six minutes for the Special Taxing Districts, and less for civic associations and individuals. The Council also announced that it would not allow cross-examination of speakers, although it would at the conclusion of all testimony provide time for rebuttal by any previous speaker wishing to challenge or correct prior statements or material. Timely objection to this procedure was made by the appellees. Twenty-five witnesses testified at these hearings and the entire record of the public hearings on the Preliminary and Final Draft Sector Plan was made a part of the record. After holding a final work session, the Council adopted Resolution No. 7-1849 on July 16, 1974, granting the sectional map amendment.

5. The Planning Commission adopted the approved Sector Plan on June 12, 1974.

As required by § 59-208 of the County Code (1972), the Council filed an opinion "setting forth its conclusions and reasons" for granting the sectional map amendment. After noting that the map amendment was filed to implement the Adopted Sector Plan, and that that Plan was the detailed development plan for the Friendship Heights CBD recommended by the B-CC Master Plan, the Council said:

"In the February 27, 1974 worksession, the County Council, after a careful study of the voluminous evidence, accepted the traffic capacity figures and trip generation rates as a basis for proceeding on the Sector Plan; i.e., an overall modal split of 20%,[6] generation factors of 1.5 trips/1,000 square feet of office space, 3.6 trips/1,000 square feet of retail space, and 0.7 trips/residential dwelling unit, and the traffic capacity limitation of 11,000 p.m. peak hour development-induced trips. The County Council found the above-mentioned figures reasonable with regard to the use and traffic capacity for the subject area and that there is substantial technical and experimental bases for the estimation that there should be 11,000 locally generated peak hour trips.

"The County Council in dealing with the issues of density and land use found it appropriate to analyze land use questions as they relate to both density and use, and then to translate them into considerations dealing with the recommended land use designations. The Council, in applying the new CBD zones to certain parcels in the study area, examined the question of the development limits that would be applicable within the Friendship Heights Central Business District. The Council has concluded that, given the traffic capacity figures and trip generation rates, the land use designations

---

6. A 20% modal split, in traffic planning parlance, means that 20% of all trips being made to, from, and through Friendship Heights will be by modes of transportation other than automobile, with 80% of the trips being by automobile.

which appear in the adopted and approved Friendship Heights Sector Plan will allow development to occur that will not overload the existing transportation system and other public facilities.

"The Council in limiting the number of new trips to be generated in Friendship Heights has recognized that the air quality of the area should be preserved at pollutant levels below federal and state air quality ceilings. Although future regulation concerning air quality may preclude some development, it was concluded that the constraints placed upon traffic will result in the stabilization of the air quality in the Friendship Heights area.

"In designating CBD zones to areas within the Friendship Heights Central Business District, the Council has recognized that the CBD zones were designated to assure that future development will provide more green space, setbacks, and human amenities than have characterized Friendship Heights development in the past. The existing development within the Friendship Heights Sector Plan Area comprises 1,028,000 square feet of office use, 437,000 square feet of retail use, 230 motel units, and 2,999 residential dwelling units. These uses include several large office buildings, several department stores including Woodward and Lothrop and Sak's Fifth Avenue, and a number of apartment and condominium buildings. In order to assure that the scale of development in the future will result in a quality of life that would be appropriate for areas such as Friendship Heights, the approved and adopted Sector Plan allows for an additional 555,000 square feet of office use, 375,000 square feet of retail use, 1,648 residential dwelling units, and a projected total population in the Sector Plan Area of 6,000 persons.

"The County Council further recognized that the

Friendship Heights Sector Plan Area is surrounded by a single family residential areas and that these neighborhoods must be protected and buffered from the development occurring in the central business district. In approving the Sector Plan for the Friendship Heights Central Business District, the County Council felt that the land uses designated in the Sector Plan would not adversely impact the lifestyles and quality of life found in the nearby neighborhoods and yet would provide those persons desiring a more urbanized setting the opportunity to live in an area such às the Friendship Heights Central Business District."

\* \* \*

". . . The County Council finds from this evidence [of record] that it would be in the public interest, and serve to protect the public health, safety and welfare that Sectional Plan Amendment F-947 should be granted."

(3)

In reversing the Council's resolution granting the sectional map amendment, the lower court held that the Council's refusal to permit cross-examination at the sectional map amendment hearings, or to afford property owners sufficient time to present evidence, violated §§ 59-204 and 59-207 of the County Code, as construed in *Hyson v. Montgomery County*, 242 Md. 55, 217 A. 2d 578 (1966), without regard to whether the rezoning was local (piecemeal) or comprehensive.

Appellants contend that the principles enunciated in *Hyson* relating to the right of cross-examination apply only to local map amendment hearings involving a piecemeal rezoning and not to a sectional map amendment proceeding filed by the Council which effectuates a comprehensive rezoning. They also argue that the lower court was in error in holding that the appellees were not afforded adequate time to present evidence at the sectional map amendment hearings before the Council. They maintain that since the

lower court found that the rezoning was comprehensive and otherwise lawful, its action in reversing the Council's resolution was improper. The appellees claim that Judge Miller correctly held that they were denied their right of cross-examination and sufficient time to submit evidence into the record at the sectional map amendment hearings. They contend that Judge Miller was also correct in holding that §§ 59-204 and 59-207 of the County Code, as construed in *Hyson,* applied to comprehensive as well as piecemeal rezoning. They argue, however, that he was wrong in concluding that the rezoning in this case was comprehensive. Whether the rezoning was comprehensive and valid is thus a threshold issue in the case to which we initially turn our attention.

(4)

The parties agree that under our cases,[7] so succinctly synthesized by the Court of Special Appeals in *Grooms v. LaVale Zoning Board,* 27 Md. App. 266, 277, 340 A. 2d 385 (1975), a comprehensive zoning plan is one which applies to or covers a substantial or wide geographical area. The zoning plan must be well thought out, the product of careful consideration and extensive study, and based upon considerations concerning the common needs of the particular area. It must be designed to control and direct the use of land and buildings according to present and planned future conditions, to accomplish as far as possible the most appropriate uses of land consistent with the public interest and the safeguarding of the interests of the individual property owners. Other characteristics of comprehensiveness may be found in the fact that the plan zones all, or substantially all, of a political subdivision, that it regulates all uses, or that it covers all of the usual factors of land utilization: height, area and use.

---

7. Nottingham Village v. Baltimore Co., 266 Md. 339, 354-55, 292 A. 2d 680, 688 (1972); Scull v. Coleman, 251 Md. 6, 10-11, 246 A. 2d 223, 225 (1968); Trustees v. Baltimore County, 221 Md. 550, 561, 158 A. 2d 637, 642 (1960); Hewitt v. Baltimore County, 220 Md. 48, 151 A. 2d 144 (1959); Huff v. Bd. of Zoning Appeals, 214 Md. 48, 133 A. 2d 83 (1957); Anne Arundel County v. Ward, 186 Md. 330, 46 A. 2d 684 (1946).

Appellees contend that to constitute valid comprehensive rezoning, the proposed changes must be related to land use planning and overall zoning policies for an entire planning area, here the 22-square-mile B-CC planning area of which Friendship Heights is but a small part. They contend that zoning through sectional map amendment in Montgomery County has always been based exclusively upon an approved General Plan or local Master Plan, but that the Adopted Sector Plan for the Friendship Heights CBD, and the sectional map amendment which implements it, represent a drastic departure from the recommendations of these basic planning documents, both of which call for intensification of development and expansion of the Friendship Heights area. Appellees claim that because the Adopted Sector Plan has no comprehensive land use planning basis, it cannot constitute a valid amendment to the General Plan or the B-CC Master Plan. It is nothing more, they say, than a detailed study of individual parcels of land within the CBD considered in isolation from the relevant planning area and consequently the sectional map amendment in reality is but a parcel-by-parcel local piecemeal rezoning which must be judged by the "change-mistake" rule.[8]

We think the Adopted Sector Plan, upon which the sectional map amendment was based, plainly constitutes the detailed development plan for the Friendship Heights CBD called for by the B-CC Master Plan, the need for which was also recognized in the General Plan. We view the Adopted Sector Plan as a valid amendment to these planning documents and therefore find no merit in the suggestion that because the Adopted Sector Plan does not include the entire B-CC planning area, the sectional map amendment lacks a comprehensive land use planning basis. There is no

8. Under the "change-mistake" rule, to sustain a piecemeal zoning change, there must be produced strong evidence of mistake in the original zoning or else evidence of a change in conditions resulting in a substantial change in the character of the neighborhood. Rockville v. Henley, 268 Md. 469, 302 A. 2d 45 (1973); Clayman v. Prince George's Co., 266 Md. 409, 292 A. 2d 689 (1972); Heller v. Prince George's Co., 264 Md. 410, 286 A. 2d 772 (1972). The rule has no application in comprehensive rezoning cases. Scull v. Coleman, supra.

requirement that the area covered by a sectional map amendment coincide with the area of the relevant Master Plan; it need only apply to a "section of the Maryland-Washington Regional District" (§ 59-195 of the zoning ordinance). Nor is there any requirement, absent a statute, that the map amendment must adhere to the recommendations of the General or Master Plan. Such land use planning documents represent only a basic scheme generally outlining planning and zoning objectives in an extensive area, and are in no sense a final plan; they are continually subject to modification in the light of actual land use development and serve as a guide rather than a strait jacket. *Nottingham Village v. Balto. Co.*, *supra* (266 Md. at 354). *See also Pattey v. Board of Co. Comm'rs*, 271 Md. 352, 317 A. 2d 142 (1974); *Iverson v. Zoning Board*, 22 Md. App. 265, 322 A. 2d 569 (1974). Moreover, contrary to appellees' suggestion, the Adopted Sector Plan is by no means fundamentally inconsistent with either the General Plan or the B-CC Master Plan; it represented but a specific modification of the planning and zoning objectives broadly outlined in those documents based on existing land use facts.

While the Adopted Sector Plan was limited to a study of a 78-acre planning area and its immediate environs, and did not cover a wide geographical area in the county, we think the 41-acre area rezoned by the sectional map amendment does comprise, in the particular circumstances of this case, a "substantial" area for purposes of determining whether the rezoning was comprehensive. What is a "substantial" area in this context cannot be measured solely in terms of the acreage covered by the zoning plan, but rather may take into account the substantiality of existing and proposed land use within the area, the fact that the area rezoned embraces an entire political subdivision, population, intensity of development, and whether the plan purports to address the common needs of a particular district. *Nottingham Village v. Baltimore Co.*, *supra; Scull v. Coleman, supra; Anne Arundel County v. Ward, supra.*[9] In other words, the test of

9. Anne Arundel County v. Ward, *supra*, involved an original zoning. Our predecessors there held that the requirement for comprehensiveness was met "if due consideration is given to the common needs of a particular

a "substantial" area for purposes of comprehensive zoning is a flexible one and depends on the circumstances. In *Border v. Grooms*, 267 Md. 100, 109, 297 A. 2d 81 (1972), a piecemeal zoning case involving a determination of whether there had been a change in the "neighborhood," we recognized that "the concept of a neighborhood is a flexible one and will vary according to the geographical location involved, it being axiomatic that in a rural or semi-rural area the 'neighborhood' will be larger and more fluid than in a city or suburban area." By analogy, the rationale of that case is applicable here in regard to our determination of whether a sectional map amendment, which purports to be a comprehensive rezoning, applies to or covers a "substantial" geographical area.

As previously indicated, the Friendship Heights CBD is one of five such districts in Montgomery County, encompassing within its well-defined borders an intensely developed political subdivision with a population projected to increase to 6,000 persons under the development plan outlined in the Adopted Sector Plan. Although a rezoning of 41 acres in a rural setting would not likely be considered "substantial," the rezoning of that amount of land in Friendship Heights by sectional map amendment which regulates all uses of properties within the CBD indeed covers a "substantial" area within the contemplation of our cases. We therefore agree with the lower court that the geographic requirement for comprehensive rezoning has been satisfied.

All other requisite indicia of comprehensiveness are also present. Underlying adoption of the sectional map amendment was a well thought out, carefully considered and extensively studied (for over three years) plan, correlated to the common needs of the Friendship Heights area. There was massive participation in the planning process by property owners, citizens, governmental officials,

district." 186 Md. at 340. In his oft-cited article in 68 Harv. L. Rev. 1154, 1161 (1955) entitled *"In accordance with a Comprehensive Plan,"* Professor Charles M. Haar expressed the view that under the holding of the *Ward* case, "a governmental unit could select any relatively small segment of its land for regulation, so long as that regulation was coherent and rationally supportable in reference to the district involved."

developers, expert witnesses, and civic and community associations. The plan took into account, as a primary constraint, severe limitations on the street system, and also inadequacies of sewerage transmission and disposal, the effects of air pollution and other environmental constraints. As heretofore indicated, the requirement for a comprehensive plan is met "if due consideration is given to the common needs of a particular district," *Anne Arundel County v. Ward, supra* (186 Md. at 340), and we think the sectional map amendment in this case plainly meets that criterion.

We think the record in this case fully supports the lower court's holding that the rezoning was designed to control and direct the use of land and buildings according to present and planned future conditions, so as to accomplish the most appropriate uses of land, consistent with the public interest and the safeguarding of the interests of the individual property owners. No useful purpose would be served by a detailed or extended discussion of the volumes of evidence before the Council relating to traffic and environmental constraints upon the scale of permissible development in the Friendship Heights area. Suffice it to say that the record convincingly demonstrates that the rezoning was comprehensive and bore a substantial relationship to the public health, comfort, safety, convenience, morals and general welfare; as such it enjoys a strong presumption of validity. *See County Council v. District Land,* 274 Md. 691, 337 A. 2d 712 (1975); *Montgomery Co. Council v. Leizman,* 268 Md. 621, 303 A. 2d 374 (1973); *Norbeck v. Montgomery County,* 254 Md. 59, 254 A. 2d 700 (1969). Zoning is, of course, a legislative function and our review of the acts of the zoning authority is restricted and narrow in scope. We decide only whether the zoning action was arbitrary, discriminatory or illegal; we do not substitute our judgment for that of the zoning authority if its decision is supported by substantial evidence and the issue is fairly debatable. *Ark Readi-Mix v. Smith,* 251 Md. 1, 246 A. 2d 220 (1968); *Trustees v. Baltimore County, supra.* Appellees have not overcome the presumption that the rezoning was valid and

bore the necessary relationship to the general public interest and welfare.

In concluding that the sectional map amendment constituted comprehensive rezoning, we note the presence of other cardinal characteristics of comprehensiveness, *i.e.*, all property within the CBD was rezoned by regulating all uses and covering all of the usual factors of land utilization — height, area and use. In addition, the area rezoned encompassed an entire political subdivision of the county.

The record does not support appellees' suggestion that the rezoning constituted a political decision to satisfy some property owners at the expense of others. Nor is it necessary to show by specific evidence, as appellees argue, that the rezoning benefits all of the citizens of the county. *Norbeck v. Montgomery County, supra; Anne Arundel County v. Ward, supra.* Finally, appellees' argument that the rezoning was not comprehensive because only 24 of the 41 acres affected were actually downzoned is equally without merit. That few changes may have been made in a comprehensive rezoning plan does not change its character or alter its nature. *See Scull v. Coleman, supra* (251 Md. at 11-12.)

(5)

We think the lower court was wrong in holding that even though the rezoning was comprehensive, *Hyson v. Montgomery County, supra,* mandated that the appellee property owners be afforded a right to cross-examine witnesses at the sectional map amendment hearings before the Council.

Unlike the present case, *Hyson* involved a single lot piecemeal rezoning. The basic question before the Court was whether the Montgomery County zoning ordinance required that cross-examination be permitted at the hearing on the application for reclassification. It was contended that since the Council was acting in a quasi-judicial capacity, it was required to conduct a "trial-type" hearing, at which parties were entitled as a matter of right to cross-examine witnesses.

The provisions of the zoning ordinance involved in *Hyson,*

now §§ 59-204 and 59-207 of the County Code (1972) (the same sections as are involved in the present case), provide for a public hearing in connection with an application for an amendment of the zoning map. Section 59-204 affords any interested person "the right to submit oral or written testimony or documentary evidence into the record at the hearing"; it also provides that "a complete stenographic report . . . and a typewritten transcript thereof" shall be made; that the transcript, the application for the amendment, the zoning map, and all exhibits shall be considered as parts of the record; and that "evidence [offered at the hearing] which is immaterial, irrelevant, or unduly repetitious may be excluded." Section 59-207 provides that the Council shall determine the merits of the application "on the basis of the evidence of record."

It was in "the light of these provisions" of the zoning ordinance that the Court in *Hyson* said that it was required to "determine . . . the type of public hearing which the Council was required to afford, and the nature of the functions exercised by the Council at such hearing . . . ." 242 Md. at 64. While the Court recognized that the actual act of zoning and rezoning was legislative or quasi-legislative in nature, it said that it was "inaccurate to characterize the whole proceeding at the hearing held by the Council when considering an application for reclassification and its action of denying or granting reclassification as quasi-legislative in nature or quasi-judicial in nature." *Id.* Referring to §§ 59-204 and 59-207 of the zoning ordinance, the Court said that these provisions "required the . . . Council to resolve disputed questions of adjudicative facts (as contradistinguished from legislative facts or judicial *action)* concerning particular parties." *Id.* "Adjudicative facts" were recognized by the Court, citing 1 Davis, *Administrative Law Treatise*, § 7.02 (1958) [hereinafter cited as *Treatise*], as "roughly" the kind of facts that go to a jury in a jury case. The Court said:

"[W]hen the Council was considering and determining these adjudicative facts concerning particular parties, it necessarily was performing a

quasi-judicial function, even though its final action, in granting or denying the reclassification which was required to be based upon its findings of adjudicative facts, was quasi-legislative in character." 242 Md. at 65.

The Court concluded that §§ 59-204 and 59-207 of the zoning ordinance conferred quasi-judicial functions upon the Council in making its determination of the facts at the piecemeal rezoning hearing and that a reasonable right of cross-examination must be allowed. It said at 67:

"The authorities seem to be in accord that when an administrative board or agency is required to hold a public hearing and to decide disputed adjudicative facts based upon evidence produced and a record made, that a reasonable right of cross-examination must be allowed the parties. Professor Davis, *op. cit.*, § 7.05, states the proposition in this manner: 'When the adjudicative facts are in dispute, our legal tradition is that the party affected is entitled not only to rebut or explain the evidence against him but also to "confront his accusers" and to cross-examine them.' We have no intention of attempting to promulgate a comprehensive rule respecting the type or the amount of cross-examination that the Council must provide at hearings on applications for reclassification. The rationale of the cases and authorities is that reasonable cross-examination, which is required for a full and true disclosure of the facts, having due regard to the circumstances of each particular case, the nature of the proceedings, and the character of the rights which may be affected by it must be permitted; and that is as far as we are required to go at this time." (Footnote omitted.)

The lower court in the present case rejected the argument that *Hyson* applied only to piecemeal rezoning hearings. It said that the Council performed a quasi-judicial function in

developing the record and it could make no distinction between procedures to be followed at local and sectional map amendment hearings because the requirement that the determination be made on the basis of the evidence of record, and upon the merits, applied equally to both types of map amendment hearings. The lower court concluded that there was no significant distinction between the type of facts or parties involved in the piecemeal rezoning in *Hyson* and those involved in the instant case. It said that the Council's decision in each case was based upon the same type of facts, *i.e.*, both were "adjudicatory in character." The lower court concluded that the due process clause of the Fourteenth Amendment did not mandate the result which it reached, but rather that the right to cross-examine was based "purely" upon the provisions of the zoning ordinance, as construed in *Hyson*. The court ultimately narrowed its holding; it said that cross-examination need not be extended to the parties in all comprehensive rezoning hearings but "where comprehensive rezoning is effected by a sectional map amendment which adopts a sector plan and consequently rezones property within a CBD, the District Council must afford to the parties, upon request, a reasonable opportunity for cross-examination."

Properly to be inferred from a statutory right to a public hearing on a zoning map amendment application is a right to a fair hearing in all respects, including the privilege of introducing evidence and the duty of deciding in accordance with the evidence. *Ford v. Baltimore County*, 268 Md. 172, 300 A. 2d 204 (1973); *Heath v. M. & C. C. of Baltimore*, 187 Md. 296, 49 A. 2d 799 (1946). There is, of course, no literal requirement in §§ 59-204 or 59-209 that a right of cross-examination must be afforded to interested persons at map amendment hearings. *Hyson* implies the existence of that right in piecemeal rezoning cases. It views the right as one of fundamental importance in such cases, which exists either as a requirement of due process or by reason of the right to a public hearing itself, because the facts to be determined are deemed adjudicative and the Council's function as quasi-judicial in nature. We have reaffirmed the

rationale of *Hyson* in later zoning cases, none of which, however, involved comprehensive rezoning.[10] The result reached in *Hyson* was premised largely on the distinction drawn between adjudicative and legislative facts by Professor Davis in his *Treatise*, but our reliance on that work may have been unwarranted. Indeed, Professor Davis has criticized our holding in *Hyson*, suggesting that even in piecemeal rezoning hearings no adjudicative facts are involved. He said in the 1970 Supplement to his *Treatise:*

> "The [*Hyson*] court quoted from § 7.05 of the Treatise that cross-examination should be allowed when adjudicative facts are in dispute, but it did not demonstrate that adjudicative facts were in dispute. A concurring judge persuasively argued that cross-examination was unnecessary because what the Council was doing was rezoning of four acres, a legislative function. The concurring judge objected to the court's requirement of cross-examination, 'Professor Davis to the contrary notwithstanding,' but he cited no Davis position to the contrary. Nor could he, for that position is that opportunity for cross-examination should be required if but only if adjudicative facts are in dispute." Davis, *Administrative Law Supplement,* § 7.04, at 323 (1970).

We recognized in *Chevy Chase Village v. Board,* 249 Md. 334, 239 A. 2d 740 (1968), that a "judicial" or "trial-type" hearing is not a requirement of procedural due process where an administrative agency does not act in a quasi-judicial capacity and the facts to be determined are "legislative" rather than adjudicative in nature. *See also Albert v. Pub. Serv. Commission,* 209 Md. 27, 120 A. 2d 346 (1956). The difference between adjudicative and legislative

---

10. *See* Birckhead v. Board of Co. Comm'rs, 260 Md. 594, 273 A. 2d 133 (1971); Bayer v. Siskind, 247 Md. 116, 230 A. 2d 316 (1967); Town of Somerset v. Board, 245 Md. 52, 225 A. 2d 294 (1966); Gorin v. Board of Co. Comm'rs, 244 Md. 106, 223 A. 2d 237 (1966). *See also* Annot., 27 A.L.R.3d 1304 (Right to Cross-Examination of Witnesses in Hearings before Administrative Zoning Authorities) (1969).

facts is not easily drawn; Professor Davis says that adjudicative facts are facts about the parties and their activities, businesses and properties. They usually answer the questions "of who did what, where, when, how, why, with what motive or intent" while legislative facts "do not usually concern the immediate parties but are general facts which help the tribunal decide questions of law and policy and discretion." Davis, *Treatise*, § 7.02. The difference, broadly speaking, involves whether the decision is to be made on individual or general grounds. Davis, *Treatise*, § 7.04. Simply because an individual has a protected interest does not entitle him to a trial-type hearing where the matter to be determined involves issues of legislative fact. Davis, *Administrative Law of the Seventies*, §§ 7.00-1 — 7.00-11 (1976). That the effect of a zoning authority's decision may dramatically affect an individual is not determinative of the difference between adjudicative and legislative facts; rather, it is the nature of the decision's fact-finding process, not the ultimate effect of the decision, that determines the party's right to an adjudicatory hearing. *Powelton Civic Home Own. Ass'n v. Department of H. & U. Dev.*, 284 F. Supp. 809, 830 (E.D. Pa. 1968).[11]

The appellants contend, and we agree, that in comprehensive rezoning proceedings the Council does not consider and determine adjudicative facts concerning particular parties within the contemplation of our decision in *Hyson*. A real distinction exists between piecemeal and comprehensive rezoning hearings; it lies in the nature of the basic function being performed by the zoning authority in each case. In a local map amendment proceeding in Montgomery County, the zoning authority considers a single piece of property and must make a factual determination, based on evidence of record, as to whether there has been a change in the physical character of the neighborhood where

11. The court there said (p. 829) that where the decisions to be made by the administrative agency require factual findings on the particular status of a particular individual an adjudicatory hearing may be necessary; but where the decisions rest on more general findings requiring analysis and evaluation of factors not uniquely related to any specific individual, no such hearing would be required.

the property is located or a mistake was made in the original zoning. Piecemeal rezoning hearings, therefore, contemplate an adversary or trial-type procedure to resolve adjudicative facts. A different determinative standard applies where the Council is considering a comprehensive rezoning by the sectional map amendment process; there its focus is not on a single piece of property, but rather on a considerable number of properties as they relate to each other and to the surrounding area. The Council in that instance considers whether the comprehensive rezoning takes into account future public needs and purposes; whether it is designed to provide an adequate potential for orderly growth in the future and to satisfy local and regional needs; and ultimately whether it bears the requisite relationship to the public health, safety and general welfare. As appellants correctly point out, these are not adjudicative determinations affecting one property owned by one person, but instead are classically legislative determinations designed to affect local and regional needs and all property owners within the planning area. The procedure is fundamentally legislative and no significant quasi-judicial function is involved. That the Council determined the zoning for each specific property owned by the various appellees and considered the impact of traffic and environmental constraints upon the scale of permissible development within the CBD does not alter the basic fact that the issues for determination were legislative, not adjudicative, and did not require a judicial or trial-type hearing. *See South Gwinnett Venture v. Pruitt,* 491 F. 2d 5 (5th Cir. 1974) (en banc);[12] *Fasano v. Board of County Com'rs of Washington Cty.,* 264 Ore. 574, 507 P. 2d 23 (1973); *Fleming v. City of Tacoma,* 81 Wash. 2d 292, 502 P. 2d 327 (1972). Accordingly, we hold that there was no constitutional or other right arising from §§ 59-204 and 59-207 to cross-examine witnesses at the sectional map amendment hearings involved in this case. Indeed, in its most recent pronouncement on the subject, the Supreme Court has indicated that it would not constitute a deprivation of

12. *Rev'g* 482 F. 2d 389 (5th Cir. 1973), *cert. denied,* 419 U. S. 837 (1974).

procedural due process if no hearing was permitted either in a piecemeal or comprehensive rezoning action. *See Eastlake v. Forest City Enterprises, Inc.,* 426 U. S. 668, 96 S. Ct. 2358, 49 L.Ed.2d 132 (1976). *See also Bi-Metallic Inv. Co. v. State Bd. of Equalization,* 239 U. S. 441, 36 S. Ct. 141, 60 L. Ed. 372 (1915); *San Diego Bldg. Contr. Ass'n v. City Coun. of San Diego,* 13 Cal. 3d 205, 118 Cal. Rptr. 146, 529 P. 2d 570 (1974), *appeal dismissed,* 427 U. S. 901, 96 S. Ct. 3184, 49 L.Ed.2d 1195 (1976).

(6)

The lower court also relied upon *Hyson* in holding that the Council's resolution granting the sectional map amendment required reversal because the appellee property owners were afforded only eight minutes each to testify at the sectional map amendment hearings. It said that *Hyson:*

> "makes it clear that where a legislative body must make its decision on 'evidence of record', and that record making requires an adjudicatory fact finding process, the legislative body must comply with due process requirements. The District Council's action in announcing a time limitation and, in effect, denying the appellants a fair opportunity to participate in the record making process by presenting direct evidence or rebuttal testimony after cross-examination directly contravenes the holding of *Hyson,* supra. That is not to say that fair limitations cannot be made as to repetitious or irrelevant testimony, but as the matter stands the District Council's action in announcing the eight minute time limitation was arbitrary and capricious and requires a reversal of this rezoning."

In *Hyson,* our predecessors said that zoning authorities have discretion "to regulate, reasonably, the length of time afforded parties to present their evidence" and that "[w]hether constitutional or statutory requirements, or the elements of fair play and impartiality have been violated in this regard should also be decided on a case to case basis."

242 Md. at 69-70. We think the lower court erred as a matter of law in concluding, in the circumstances of this case, that the eight-minute time limitation was arbitrary and capricious.

The appellee property owners were accorded the most time to present evidence at the hearing, *i.e.*, eight minutes each, or almost five hours collectively for the 37 individual property owners involved. Pooling of time was permitted in order to make joint presentations, if desired, and each property owner was afforded the right to submit written material and exhibits without restriction. Each property owner was permitted to rebut any evidence offered into the record without regard to the eight-minute time limit. The Council advised all property owners a week in advance of the hearing as to the time limits that would be imposed. Two days were consumed by the Council in conducting the hearings and massive amounts of evidence previously submitted during the sector plan hearings were incorporated into the record, much of which presented the views espoused by and on behalf of the appellee property owners.

*Wash. Co. Taxpayers Ass'n v. Board*, 269 Md. 454, 306 A. 2d 539 (1973), involved a public hearing before a county Planning Commission on a proposed comprehensive plan at which a three-minute time limit was imposed on each speaker. We there noted the necessity for imposing reasonable time limitations upon speakers at public hearings involving widespread public interest. We found the three-minute time restriction there imposed, when coupled with the right to submit supplemental written statements, to have been reasonable in the circumstances and not to have impaired the validity of the hearing. To similar effect, see *Freeland v. Orange County*, 273 N. C. 452, 160 S.E.2d 282 (1968). *See also Reed v. California Coastal Zone Conservation Com.*, 55 Cal. App.3d 889, 127 Cal. Rptr. 786 (1975).

We think the appellee property owners were not deprived of any constitutional or other right arising under § 59-204 of the zoning ordinance by reason of the imposition of the challenged time constraint. What the Council did in the

circumstances of this case, everything considered, was both reasonable and fair and in substantial compliance with the legislative mandate. Particularly when considered in conjunction with the opportunity afforded the property owners to submit evidence into the record to supplement their oral presentations, the eight-minute limitation did not compromise their right effectively to make their views known to the Council.

(7)

The appellees next contend that the Council's action in adopting the Sector Plan and the sectional map amendment was unlawful because in creating the new CBD zones it violated the provisions of Maryland Code, Art. 66D, § 8-101 by illegally delegating its zoning power "to determine the density and distribution of population," vis-à-vis, the optional method of development of the CBD zones, to the Montgomery County Planning Board of the Planning Commission.[13]

As heretofore indicated, the CBD zones are authorized by §§ 59-51.3, .4, and .5 of the County Code (1975 Cum. Supp.); they provide for a standard and an optional method of development. The zones were intended to encourage residential and commercial development at densities supportable by existing and proposed public facilities which would be compatible with the surrounding areas. A property with a CBD zoning classification may, under the provisions of the zoning ordinance, be developed as a matter of right in accordance with the standard method of development, or if it contains a minimum of 22,000 square feet, the owner may apply for the optional method of development which permits more intense development but provides for open spaces and other facilities and amenities. *See, e.g.,* § 59-51.3 (a). Unlike the standard method, the optional method of development requires approval of the Planning Board upon compliance with specified development standards and after detailed site

---

13. The members of the Planning Commission appointed by the Montgomery County Council constitute the Montgomery County Planning Board. Art. 66D, § 7-111.

plan review. The property owner is required to file a detailed application with the Planning Board under § 59-31.2 of the zoning ordinance for the optional method of development and submit a site plan and other detailed information. A public hearing is mandated and the Planning Board, in order to approve an application, must find that it meets certain designated requirements enumerated in § 59-31.2 (e) (1) and (2) and that the detailed site plan complies with specified factors contained in § 59-31.3.

The optional method of development is not, as appellees suggest, a separate and distinct zone over which the Planning Board exercises exclusive control contrary to the Regional District Act. It is, as its designation implies, an optional method for developing property located in a CBD zone which has been legislatively predetermined to be compatible with uses within the zone; it may be utilized or not, at the option of the property owner. The Planning Board does not determine the density and distribution of population. The Council in its legislative capacity enacted the CBD zones with predetermined maximum allowable densities and it delegated to the Planning Board the administrative function of determining, pursuant to carefully drawn procedural guidelines, including site plan review, the actual appropriate density for a specific property up to legislatively specified maximum densities. *See, e.g.,* § 59-51.3 (f) (1) b.

Executing the policy of a zoning ordinance is an administrative function that may be properly delegated to administrative boards or officials under specified procedural guidelines. 8 McQuillin, *Municipal Corporations* § 25.35 *et seq.* (3rd ed. rev. 1976); *Baltimore County v. Mo. Realty,* 219 Md. 155, 148 A. 2d 424 (1959); *Huff v. Bd. of Zoning Appeals,* 214 Md. 48, 133 A. 2d 83 (1957); *Pressman v. Barnes,* 209 Md. 544, 121 A. 2d 816 (1956). We see no illegal delegation of zoning powers to the Planning Board in this case.[14] Nor is

14. Section 59-31.2 (e) (4) was declared invalid by the lower court on the ground that it constituted an improper delegation of the zoning power to the Planning Board. That subsection provided that "The fact that an application complies with all of the specific requirements and purposes of the applicable zone shall not be deemed to create a presumption that the

there merit in the appellees' argument that the standards and guidelines contained in § 59-31.2 of the zoning ordinance to govern the exercise of the delegated powers are not sufficiently clear to prevent arbitrary interpretation and discriminatory application, or to assure an applicant approval under the optional method of development, given the meeting of certain minimum conditions. *Compare Pr. George's Co. v. M & B Constr. Co.*, 267 Md. 338, 297 A. 2d 683 (1972); *Knudsen v. Montgomery County*, 241 Md. 436, 217 A. 2d 97 (1966); *Beall v. Montgomery County*, 240 Md. 77, 212 A. 2d 751 (1965); *Costello v. Sieling*, 223 Md. 24, 161 A. 2d 824 (1960); *Rockshire Civic Ass'n v. Rockville*, 32 Md. App. 22, 358 A. 2d 570, *cert. denied*, 278 Md. 732 (1976); *Marathon Oil Co. v. Township of Plymouth*, 25 Mich. App. 399, 181 N.W.2d 668 (1970); *Cheney v. Village 2 at New Hope, Inc.*, 429 Pa. 626, 241 A. 2d 81 (1968).

(8)

Appellees next contend that the CBD zones violate the uniformity requirements of Maryland Code, Art. 66D, § 8-102, which provide that "all [zoning] regulations shall be uniform for each class or kind of building throughout any district or zone, but the regulations in one district or zone may differ from those in another district or zone." They argue that they are denied uniformity of treatment in four particulars, viz:

"1. As compared to property owners in other CBD's within the same zoning district, the permitted FAR (floor area ratio) is limited under the new CBD zones so that parking accommodations in excess of fifty percent (50%) of stated requirements are computed as part of the building FAR. On the other hand, in Bethesda (another Central Business District within the same planning district), property owners are allowed to meet the parking requirements, and at the same time, utilize fully the maximum FAR.

application shall be approved." The lower court held that the provision was severable and no appeal was taken from that determination; we do not pass on the question.

"2. As applied, the CBD zones do not provide uniformity of treatment for properties similarly situated ... [because] only those properties of 22,000 square feet or more are eligible for the 'Optional Method of Development' (which allows a density of 2 to 2.5 times that of the standard method of development).

"3. [T]he CBD zones fail to assure there will be no discrimination ... [because] the Planning Board in both the 'Optional Method of Development' application process (§ 59-31.2) and 'Site Plan Review' (§ 59-31.3) has complete authority to dictate and specify to an applicant that his development will be approved only if it conforms to the use and density recommendations set forth in the adopted Sector Plan.

"4. The non-conforming use provisions of the CBD zones, §§ 59-51.3(g), 59-51.4(g) and 59-51.5(g) impose substantial and severe hardships upon many property owners in that sound buildings constructed prior to 1959 (e.g., Woodward and Lothrop on parcel 2) are treated as non-conforming uses, while buildings constructed after 1959 are given a grace period from the effect of the ordinance for seven (7) years."

The uniformity provision contained in Art. 66D, § 8-102 was derived from § 2 of the Standard State Zoning Enabling Act, as to which it was said in 1 Anderson, *American Law of Zoning*, § 5.22 (2d ed. 1976), that the purpose of the provision was mainly a political rather than a legal one, *i.e.*, to give notice to property owners that there shall be no improper discriminations. *See Dupont Circle Cit. Ass'n v. Dist. of Col. Zoning Com'n*, 355 A. 2d 550 (D.C. Ct. App.), *cert. denied*, 429 U. S. 966, 97 S. Ct. 396, 50 L.Ed.2d 334 (1976); *Orinda Homeowners Committee v. Board of Supervisors*, 11 Cal. App.3d 768, 90 Cal. Rptr. 88 (1970). We have also recognized that invidious distinctions and discriminations in applying the uniformity requirement are impermissible. *City of Baltimore v. Mano Swartz*, 268 Md.

79, 91, 299 A. 2d 828 (1973); *Marathon Builders, Inc. v. Polinger,* 263 Md. 410, 422, 283 A. 2d 617 (1971); *Cassel v. City of Baltimore,* 195 Md. 348, 354, 73 A. 2d 486 (1950). The uniformity requirement does not prohibit classification within a district, so long as it is reasonable and based upon the public policy to be served. *Quinton v. Edison Park Development Corp.,* 59 N. J. 571, 285 A. 2d 5 (1971); *Schmidt v. Board of Adjustment of City of Newark,* 9 N. J. 405, 88 A. 2d 607 (1952); *Dupont Circle etc., supra.* The focus is upon the terminology of the ordinance, rather than upon its application. *Green Point Sav. Bank v. Board of Zoning Appeals,* 281 N. Y. 534, 24 N.E.2d 319 (1939), *appeal dismissed,* 309 U. S. 633, 60 S. Ct. 719, 84 L. Ed. 990 (1940). *See Richmark Realty v. Whittlif,* 226 Md. 273, 173 A. 2d 196 (1961); *City of Baltimore v. Byrd,* 191 Md. 632, 62 A. 2d 588 (1948).

Applying these principles, the lower court found no violation of the uniformity provision in the requirement that a certain portion of the FAR be designated for parking in the Friendship Heights CBD but not in the Bethesda CBD located in the same district. Bethesda, unlike Friendship Heights, is located in a special parking lot district. *See* County Code (1972), Ch. 60. Section 59-1 of the County Code, which defines the term "gross floor area," provides:

> ". . . Parking for either retail or office uses provided in the amount of fifty percent or less than that required by section 59-79 shall not be computed as part of the gross floor area [an element of FAR]; however, parking for such uses provided in excess of fifty percent of the stated requirements of this chapter shall be counted as part of the gross floor area. . . ."

Section 59-79 delineates the requirements for off-street parking for designated uses including retail and office uses, while § 59-66 (a) provides that the off-street parking requirements of § 59-79 shall not apply within parking lot districts. Since the appellees' properties are not located in a parking lot district, they must provide off-street parking, 50 percent of the area of which is computed as part of their

gross floor area, thus reducing the amount of area usable for retail or office purposes. That properties located in parking lot districts are not so restricted does not in itself violate the uniformity requirements of § 8-102 of Art. 66D. Those properties must either pay a parking lot district tax or provide their own off-street parking in which event they are subject to the provisions of § 59-1 of the County Code. As a consequence, all property uses which do not rely on county operated parking facilities have their gross floor area calculated in the same manner, while all property uses located within parking lot districts which do not rely on county operated facilities have their gross floor area calculated in the same manner.

Nor do we find a lack of uniformity in the requirement that properties must have a minimum of 22,000 square feet to qualify for the optional method of development. The zoning regulations apply uniformly to all parcels less than 22,000 square feet as well as those in excess of that area. The Council determined that the optional method of development would not be suitable for parcels less than 22,000 square feet,[15] and the lower court held, and we agree, that the legislative purpose of encouraging land assembly to permit cohesive development and to assure open spaces and other amenities provides a reasonable basis for the classification.

The lower court considered the appellees' third claim of violation of the uniformity requirement to be premature. It said:

"[Appellees] challenge uniformity based upon the Planning Board's authority to allocate different

---

**15.** The Adopted Sector Plan indicates the rationale and purpose for the area requirement. It is there stated:

"Fragmentation of land holdings has been a major obstacle to attractive and coordinated development of the CBD's. In order to encourage land assembly that will permit more cohesive development and assure provision of open space, pedestrian walks, and other amenities, the new system permits property owners who meet a minimum acreage requirement (22,000 square feet) to elect to use an alternative optional method of development. The optional method allows the developer somewhat higher density than can be achieved under the standard methods — but only if provisions for open space and other facilities and amenities specified by the sector plan are included."

F.A.R.'s to different parcels within the Friendship Heights CBD. . . . [T]his challenge is premature because none of the [appellees] have yet applied for the optional method of development. Until it can be established that the Planning Board has allocated different F.A.R.'s to different parcels in violation of the uniformity requirement there is no issue upon which the Court can rule."

We agree with the lower court.

With respect to the provisions of the new CBD zones pertaining to nonconforming structures, § 59-51.3 (g) (CBD-1, by way of example) provides:

"Any buildings, structures, or uses for which a building permit was issued after December 31, 1958, shall not be regarded as a nonconforming use in that they may be continued, structurally altered, or repaired, or enlarged in conformance with the requirements of this zone so long as they remain an otherwise lawful use as previously allowed.

"Any buildings, structures or uses which become nonconforming upon reclassification of property to this CBD zone shall not be subject to the provisions of sections 59-187, 59-188 and 59-189 for a period of seven years thereafter."

Sections 59-187 and 59-188 deal, respectively, with structural alterations, and change and abandonment of nonconforming uses, while § 59-189 concerns reconstruction of damaged or destroyed buildings.

While noting that pre-1959 uses are differentiated from post-1959 uses, the lower court found no lack of uniformity in the nonconforming use provisions of the CBD zoning categories. We agree. The Council's purpose, as appellants point out, was to alleviate the impact of its newly created CBD zones by providing that buildings for which building permits were issued after December 31, 1958, are not nonconforming. As to buildings for which permits were issued prior to January 1, 1959, the Council provided that

buildings, structures or uses which become nonconforming upon reclassification to a CBD zone shall not be subject to the provisions of §§ 59-187, 59-188, and 59-189 for a period of seven years. This difference in treatment is neither arbitrary nor invidiously discriminatory, but affects alike all properties similarly situated.

(9)

Appellees contend that the provisions of the zoning ordinance relating to the optional method of development of the CBD zones represent a confiscatory exer: ise of the police power. Although recognizing that the optional method is not mandatory, they nevertheless argue that its use unconstitutionally requires the dedication of public amenities like open-air plazas, quasi-public recreational facilities, community parks and illegal buffer zones. They claim that the CBD zones were superficially designed to have a purported standard method of development in order to satisfy the requirements of the "reasonable use" test prescribed in *Rockville v. Stone*, 271 Md. 655, 319 A. 2d 536 (1974), when in actuality so many limitations were imposed on that method of development that no use could ever be made of it. As a result, they say that they are frustrated in the use of their property unless they apply for and submit to the exactions and limitations required for development under the optional method. In effect, therefore, the argument is that the CBD zones deny them all reasonable use of their properties and are, therefore, illegally confiscatory.

We agree with the lower court that the appellees made no showing that they had been denied all reasonable use of their properties under the new CBD zoning classifications. There is nothing in the record before us to demonstrate that the challenged zoning deprives the appellees of all beneficial use of their properties or that the restrictions imposed were such that the properties could not be used for any purpose. *Rockville v. Stone, supra; Montgomery Co. Council v. Kacur*, 253 Md. 220, 252 A. 2d 832 (1969); *Baltimore City v. Borinsky*, 239 Md. 611, 212 A. 2d 508 (1965); *Norbeck Village*

*v. Montgomery County, supra.* As in *Stone*, there is nothing in the record to show that the soil or topographical conditions make it unfeasible to construct any type of building in compliance with the use requirements of the CBD zones. The record before us reveals only that permissible densities of appellees' properties have been significantly decreased; that showing is, of course, insufficient to demonstrate a confiscatory exercise of the zoning police power in Maryland.

With respect to the so-called Bergdoll tract, it is argued that the 3.5 acres of this property, which was rezoned by the sectional map amendment to an R-60 classification (one family, detached residential), cannot be put to any reasonable use. Since this property lies between two parcels zoned R-H (multiple family, high-rise planned residential), it is argued that it was zoned R-60 "for the sole illegal purpose of creating a buffer area and precluding its use for any other purpose" — a violation of the principles espoused in *Spaid v. Board of Co. Comm'rs,* 259 Md. 369, 269 A. 2d 797 (1970).

We recognized in *Spaid* that there may be lawful as well as unlawful buffer zones; that there may be a transitional zone of less intensive use properly placed between a residential use district and a district permitting commercial or more intensive use as long as the transitional use does not deprive the property owner of all reasonable use of his property. No valid claim of deprivation of all reasonable use can be made with respect to the Bergdoll property. There is no indication in the record that the 3.5 acres could not be used for the construction of single family homes. Moreover, as the appellants point out, the owners of the Bergdoll tract, which comprises a total of 18.19 acres, could develop a substantial portion of it high-rise with R-60 residential on the northern portion closest to like R-60 development; or it could be developed PD-44, as recommended by the Adopted Sector Plan, at a density higher than was permitted by the R-H zoning in effect prior to adoption of the sectional map amendment.

(10)

Appellees' final argument is placed under the heading of "Illegal use of Floating Zones." While they do not challenge the validity of the floating zone concept as a proper and lawful zoning tool, it is generally argued that the Council "has acted in excess of its zoning power by enactment of the CBD ordinance." Appellees repeat their earlier argument that the CBD zones leave only a residuum of permissible development as a matter of right, and they claim that any significant development must be sought under the optional method of development through approval of the Planning Board. As a result, appellees maintain that this system of zoning is an unlawful departure from the standard Euclidean method of zoning in that the scale of development is not determined on a comprehensive, cohesive basis but rather by a series of ad hoc planning decisions. They see this as a form of conditional zoning, unlawful in Montgomery County, as involving the imposition of zoning conditions via the use of floating zones.[16] We think the argument, although not lacking in esoteric qualities, is groundless as a matter of law.

As heretofore indicated, the floating zone aspect of the CBD zones revolves around the optional method of development — a method which combines a legislative predetermination of compatible uses with detailed standards to guide its application. The CBD zones are Euclidean zones with the optional method of development "built" into the zones; that method is not itself a floating zone or a special exception, although it may have some of their characteristics. As appellants indicate, the optional method provides greater assurance of compatibility and certainty of uses than do most floating zones since it has been legislatively predetermined to be compatible only with those

---

16. A floating zone is a special detailed use district of undetermined location, a district in which the proposed kind, location, size, and form of structures must be preapproved, and which, like a special exception use, is legislatively predeemed compatible with the areas in which it may thereafter be located on a particular application, provided specified standards are gratified and actual incompatibility is not revealed. The Chatham Corp. v. Beltram, 243 Md. 138, 220 A. 2d 589 (1966).

uses within the particular CBD zone. We think the utilization of the optional method of development within the CBD zones was well within the zoning powers granted to the Council; it does not constitute any form of invalid conditional zoning proscribed by the zoning ordinance and our decision in *Mont. Co. v. Nat'l Capital Realty*, 267 Md. 364, 297 A. 2d 675 (1972). *Compare Swarthmore Co. v. Kaestner*, 258 Md. 517, 266 A. 2d 341 (1970); *Huff v. Bd. of Zoning Appeals, supra.*

> *Order of the Circuit Court for Montgomery County reversing Resolution 7-1849 of the Montgomery County Council vacated; case remanded for the entry of an order in conformity with this opinion; costs to be paid by the parties identified in the opinion as the appellee property owners.*